ALCAEUS HOOPER, MAYOR OF BALTIMORE CITY, *vs.* NOBLE H. CREAGER.

*Municipal Corporations—Appointments to Office—Right of Mayor to Nominate—Invalidity of Ordinance Depriving Mayor of Participation in Appointments—Power to Regulate Does Not Include Power to Destroy—Statutory Construction—Construction of the Code.*

A power given by statute to the Mayor and City Council of Baltimore to *regulate* the *manner* of appointing persons to office under the corporation does not embrace a power to destroy the right of the Mayor to nominate such officers, subject to confirmation by the City Council, when such right is expressly conferred by statute upon the Mayor.

When the power of appointment to office is conferred upon the Mayor and City Council as separate branches of the municipal government and distributively, the former to nominate and the latter to confirm or reject in joint convention, a subsequent power given to the Mayor and City Council to pass ordinances *regulating* the *manner* of appointing officers does not authorize the passage of an ordinance, whether with the approval of the Mayor or not, whereby he is deprived of all participation in making appointments, any more than the Mayor and City Council could, under such power to regulate, divest themselves of the power of appointment altogether and delegate it to a stranger.

The power given to a municipality to regulate the manner in which a thing may be done does not include a power to prohibit altogether the doing of the thing.

Local Code, Art. 4, sec. 30, provides that the Mayor and City Council of Baltimore "may pass ordinances regulating the manner of appointing persons to office under the corporation, which they are or may be authorized by law to appoint, but unless such ordinances be

passed, the Mayor shall nominate and, by and with the advice and consent of a convention of the two Branches of the City Council, shall appoint all officers under the corporation, except," etc. *Held*, that an ordinance passed over the veto of the Mayor by which he was deprived of the power to nominate certain officers and they were made elective by a joint convention of the two Branches of the City Council is not a valid exercise of the power conferred by this section, but is *ultra vires* and void.

Statutes should be construed with a view to the original intent and meaning of the makers, and such construction should be put upon them as best answers that intention, which may be collected from the cause or necessity of making the statute, or from foreign circumstances ; and when discovered the intention should be followed, although such construction may seem to be contrary to the letter of the statute.

For the purpose of ascertaining the meaning of a section of the Code the original Act of Assembly embodied in such section may be consulted.

The Act of 1817, chap. 148, provided that the Mayor of Baltimore shall nominate and, with the consent of a convention of the two Branches of the City Council, appoint all officers of the corporation. The supplementary Act of 1828, chap. 114, provided that the Mayor and City Council may pass ordinances regulating the manner of appointing persons to office under the corporation. When these Acts were codified the latter was placed first in the same section of the Code which contained both. The City Council passed an ordinance over the veto of the Mayor providing that the Tax Collector (who had been previously nominated by the Mayor and confirmed by the City Council) should be elected by a joint convention of the two Branches of the City Council without a nomination by the Mayor. Upon a petition by a person elected Tax Collector by such convention for a *mandamus* directing the Mayor to administer to him the oath of office, *Held*,

1st. That the Act of 1817 gave to the Mayor and City Council *jointly* the power to make appointments, and also prescribed the manner in which that power should be exercised, and that the Act of 1828 did not disturb the power to make appointments, but merely conferred authority to prescribe by ordinance a different manner for its exercise.

2nd. That when these two Acts were consolidated in the Code the fact that the Act of 1828 was placed first in the same section with Act of 1817 cannot make any difference in their meaning, or cause the section of the Code containing the two Acts to mean the reverse of what the component parts as originally enacted obviously meant.

3rd. That under the Acts and under the Code the depository of the power of making appointments to office was not the municipality as

a corporate entity, but the Mayor on the one hand and the City Council on the other, as the two constituent but separate and independent departments of the government.

4th. That under the power to regulate the manner of making appointments it was not competent for the City Council to pass an ordinance by which the Mayor was deprived of all right to participate in the appointment of officers.*

---

* QUORUM FOR PASSAGE OF ORDINANCE OVER VETO.—The following authorities relating to the number of votes necessary to pass an ordinance over the veto of the Mayor were cited by counsel for the petitioner Creager in the argument of this case in the first appeal, reported in 83 Md. 490. *Local Code,* Art. 4, sec. 30, empowers *three-fourths* of both Branches of the City Council to pass an ordinance over the veto. The First Branch consists of twenty-two members and the Second Branch of eleven members. At the time of the passage of the ordinance in question over the Mayor's veto—in the First Branch three members were absent, and of the number present fifteen voted for and four against the ordinance. In the Second Branch, two members were absent, and of the nine present seven voted for and two against the ordinance. The ordinance therefore did not receive the vote of three-fourths of all the members elected, but did receive that of three-fourths of the members present. The general ruling is that the required majority of the members present and constituting a quorum is sufficient to pass a bill over a veto, and that the vote of a majority of the members composing the body is not necessary. *United States* v. *Ballin,* 144 U. S. 1 ; *Cushing Law and Practice of Legislative Assemblies,* sec. 247 ; *State* v. *Porter,* 113 Ind. 79 ; *Southworth* v. *P. & J. R. W. Co.,* 2 Mich. 287 ; *Rex* v. *Monday,* Cooper, 531 to 538 ; *Green* v. *Weller,* 32 Miss. 650 ; *Barrett* v. *Patterson,* 48 N. J. L. 400 ; *Cadmus* v. *Farr,* 47 N. J. L. 208 ; 2 *Bouvier's Law Dictionary,* " *Quorum;*" *State* v. *Kenney,* 45 N. J. L. 251 ; *Cole* v. *Trustees of Williamsburg,* 10 Wendell, 650 ; *Buell* v. *Buckingham,* 16 Iowa, 284–291 ; *Price* v. *G. R. & I. R. R.,* 13 Ind. 58 ; 1 *Dillon on Municipal Corporations,* sec. 278 ; *Warnock* v. *City of Lafayette,* 4 La. Annual, 419 ; *State* v. *McBride,* 4 Missouri, 303 ; *Green* v. *Weller,* 32 Miss. 650. That where any action is required to be performed by any given proportion of the body, as, for instance, two-thirds, or three-fifths, or three-fourths, that proportion of the members present, they being a quorum, is meant, see, for an express declaration of the law : *Cooley Constitutional Limitations,* p. 168 ; 1 *Dillon Municipal Corp.,* sec. 47, note 1 ; *Southworth* v. *R. R.,* 2 Mich. 287 ; *State* v. *McBride,* 4 Missouri, 303 ; *Green* v. *Weller,* 32 Miss. 650 ; *Manual of 52nd Congress; Opinion of City Solicitor Ritchie; Journals of the U. S. Senate, 1 s Session, 34th Congress,* 418, 419 ; *Congressional Globe, Ibid,* pp. 1544 *et seq.*

Appeal from an order of the Superior Court of Baltimore directing that a peremptory writ of *mandamus* issue commanding the Honorable Alcaeus Hooper, Mayor of the city of Baltimore, to administer to Noble H. Creager, as City Collector, the oath of office prescribed by ordinance for municipal officers, and that the petitioner recover his costs from the respondent.  The first appeal in this case is reported in 83 Md. 490.

The trial Court (RITCHIE, J.), instructed the jury to find a verdict for the petitioner, Creager, and delivered the following opinion :

When this case was before the Court on the demurrer of the petitioner to the answer of respondent, the·questions of *ultra vires*, and of the due passage over the veto of the Mayor, of the ordinance under which the petitioner claims, were fully argued by each side.   I overruled the demurrer because the pleadings did not present sufficient facts to enable me to pass on the question of the validity of the passage of the ordinance over the veto.   The mounting of the demurrer raised also the question of the sufficiency of the petition, but being of opinion that the ordinance set forth, if duly passed, was not *ultra vires*, I overruled the demurrer with leave to the petitioner to plead or traverse, and the order dismissing the petition was passed because he declined to avail of this leave, and not because of any insufficiency in the petition.   The order dismissing the petition was affirmed, but the Court of Appeals remanded the cause under Article 5, section 20, of the Code, in order that " further proceedings may be had to bring the case to trial before the Court on its merits," the filing of an opinion being postponed to a later day.

" The petitioner, Noble H. Creager, claims to have been duly appointed to the office of City Collector, and·asks that a writ of *mandamus* may issue requiring the respondent, the Mayor of Baltimore City, to administer to him as such collector the oath of office prescribed by ordinance for municipal officers.

The City Code, Art. 50, sec. 31, provides for the biennial appointment of a City Collector "as other city officers are appointed." There is no general ordinance, or statute, providing any one specific mode for the appointment of city officers. Under the ordinances as codified in the Code 1893 some are appointed by the City Council alone in joint convention, a larger number by the Mayor alone, and a still larger number by the heads of departments and municipal boards, but probably a majority of the more important officers are appointed on the nomination of the Mayor by and with the advice and consent of the City Council in joint convention. The words "as other city officers are appointed," however, have always been construed to mean an appointment on the nomination of the Mayor, subject to the confirmation of the joint convention.

The ordinance in controversy, No. 42 of 1896, purports to repeal and re-enact sections thirty-one and thirty-two of Art. 50 of the City Code. Like the Code it provides for the biennial appointment of a collector of taxes to be styled "City Collector," whose duties are to collect both city and State taxes. The only change made which is important to this case is in the mode of appointment, which, it provides, shall be by a convention of both Branches of the City Council, instead of on the nomination of the Mayor.

This ordinance, after its first passage, was vetoed by the Mayor. It was then reconsidered, and, being again put upon its passage, received an affirmative vote in each branch of three-fourths of the members present, there being more than a quorum in each, but not three-fourths of all the members of either branch. Thereafter the petitioner was appointed to the office of "City Collector" by a joint convention. He then appeared before the Mayor, whose duty it is under Article 70, sec. 5, Public General Laws, to administer the oath of office to all city officers, and requested the Mayor to administer to him the oath of office of City Collector. By Art. 1, sec. 31, of the City Code, it is provided, that all city officers shall, before entering on their

duties, take the oath set forth in Art. 1, sec. 6, of the Constitution. The Mayor refused to administer the oath of office, on the ground that he did not regard the election of the petitioner as legal, and thereupon Mr. Creager filed his petition for a writ of *mandamus*, requiring the respondent to administer the said oath of office.

I make no reference to what transpired in respect to Mr. Creager's bond, because that was disposed of on the demurrer to the answer. The case has been exhaustively argued, and many questions have been raised which I do not think it necessary to pass on.

The respondent asserts, first, that this ordinance is invalid, because it provides for the appointment of the City Collector by a convention of the two branches without the participation of the Mayor; secondly, that it was not duly passed over his veto. And, further, in case the ordinance is not void in either of these respects, he sets up other defences that are peculiar to the dual character of the City Collector, and also rests on the action of the Governor pending these proceedings. A clear understanding of the whole case, and particularly of these special grounds of defence, makes it necessary to refer in some detail to existing and previous legislation upon the subject of the collection both of city and State taxes in the city of Baltimore.

The municipal corporation, under its power to tax, and under the express recognition of such right by sec. 10 of the Act of incorporation (1796, ch. 68) has always had the right to create the office of Collector of city taxes. To go no further back, I find that such office was provided for by Ordinance No. 8 of 1826. This office is now provided for and its duties defined by Article 50 of the City Code, sub-title "City Collector." The State Code, Article 81, section 31, provides that "the Mayor and City Council of Baltimore shall, on or before the third Tuesday in April, *in each year*, or as soon thereafter as may be, appoint * * * one collector for Baltimore City for the collection of all State taxes levied or to be levied for the

current year." This power was first granted, as far as I have been able to find, under the Act of 1841, chapter 23, section 45. Prior to this, the State taxes in the city of Baltimore were, no doubt, collected by officers appointed by the Levy Court of the county.

This power was continued under the Code of 1860, but by the Act of 1865, chapter 155, it was provided that the Mayor and City Council of Baltimore, instead of one collector of State taxes for the whole city, should appoint one for *each of the three legislative districts.* The Act of 1868, chapter 366, went back to one collector, and so it is provided in the Act of 1874, chapter 483, the thirtieth section of which is now section 31 of Art. 81. By Art. 81, secs. 33–34 such " Collector of State taxes " in Baltimore City, s required to give bond to the State, to be approved by the Governor, to account with the Comptroller, and to deposit the State's money in a bank to be designated by the Treasurer ; and by sec. 36 he is to take the oath therein prescribed.

There is thus vested in the Mayor and City Council of Baltimore the power to appoint both a Collector of City taxes and a Collector of State taxes, the functions of each being perfectly distinct. The office of one is created by ordinance, his term is now two years, his bond is to the city, he takes the oath of office prescribed by ordinance, before the Mayor, and his duties are defined by the City Code. The office of the other is created by statute, his term is one year, his bond is to the State, he must take the oath prescribed by Art. 81, sec. 36, before the Clerk of the Superior Court, and his duties are defined by the State Code. While these offices are distinct and a different person may be appointed to each (Art. 81, sec. 41), the practice, except during the three years under the Act of 1865, has, for the convenience of administration, always been to appoint the same person to each office, and thus, as was the case in *McCauley* v. *State*, 21 Md. 572, unite two offices in the same person.

The respondent contends that this Ordinance No. 42 attempts to provide for the appointment of both officers by one and the same act. I concur in this construction, but not at all in the conclusions sought to be drawn therefrom. Ordinance No. 42, in this connection, is exactly like section thirty-one of the City Code, and this section (except that it provides for a biennial instead of an annual appointment) is a codification of section 1, Ordinance No. 46, of 1862. It is important to note in passing that the entire sub-title, "City Collector," is, with some immaterial amendments, the codification of the ordinance of 1862.

The ordinance of 1826, "for collecting the taxes of the city of Baltimore," already mentioned, provides only for the collection of city taxes. The next general ordinance which I find, No. 7, of 1838, also provides for city taxes only. Then follows the Act of 1841, authorizing the appointment of a Collector of State taxes, and the first general ordinance for the collection of taxes which I find after this Act, No. 11, of 1850, provides for the appointment of "a collector of all taxes" imposed either by the corporation or the General Assembly. This is the ordinance which appears in the compilation of 1858, R. O. No. 10. Next comes the ordinance of 1862, and it, and the City Code (sec. 31) and this ordinance No. 42, all in the same terms provide for the appointment at a stated time of "a Collector of taxes to be styled the City Collector," whose duty it shall be to collect all taxes levied by both the city and State.

Except during the three years when there was a State collector for each legislative district (Ord. 1866, No. 50), there never has been, so far as appears, a separate ordinance providing for the appointment of a Collector of State taxes in Baltimore. So far as the practice has been shown in evidence, it appears that in some years there would be separate appointments and qualifications for each office; sometimes separate appointments, but only one qualification; and in some years one appointment and one qualification. But, in my judgment, as stated, all these ordinances provide for the

appointment of both officers, that is, the City Collector of city taxes and the City Collector of State taxes by one and the same act of appointment; though it is necessary for the appointee to qualify separately by oath and bond for each office.

Prior to Ordinance No. 4 of 1887 the term of office of the Collector of city taxes was one year, just as was that of the Collector of State taxes, but that ordinance provided for the *biennial* appointment of a large number of city officers, including the Collector of city taxes, and in the City Code of 1893 the word "biennial" is introduced into the ordinance, and copied therefrom into the ordinance now in controversy. This ordinance therefore provides that the term of office of *each* collector shall be *two years*, whereas the term of the Collector of State taxes is limited by statute to one year.

It must be further noted that Art. 81, sec. 39, provides, that if there be no "Collector of State taxes" in Baltimore City, "*qualified*" as required, by the 15th of May in any year, the Governor shall then appoint, from any part of the State, such a Collector for the city. Under this section, and pending these proceedings, the Governor on May 15th appointed Mr. Lewis N. Hopkins as "Collector of State taxes for Baltimore City," for the term of one year, beginning on the third Tuesday of last April;" and that gentleman has filed his bond, taken the oath of office before the Clerk of the Superior Court, and is now in possession of the office of Collector of State taxes for the city.

Now, then, as this ordinance provides for the appointment by one and the same act of both collectors, the counsel for respondent have most strenuously argued, first, that the provision of a term of two years for the Collector of *State taxes* makes the ordinance *entirely void* so far as it provides for the appointment of that officer; and that the duties of the two offices are so inseparably interwoven that, being void as to the Collector of State taxes, it is void also as to the appointment of Collector of city taxes; secondly, that the

power to appoint a Collector of State taxes is conferred on the " Mayor and City Council " jointly, and cannot be delegated to a joint convention, and therefore the ordinance is void as to this office, and, because of the inseparability of the two offices, it is void altogether ; thirdly, that as the Governor has filled the office of Collector of State taxes, a Collector of city taxes could not now be qualified, because of the inseparability of the two offices, and therefore the issue of the writ of *mandamus* would be nugatory.

It is true that the term of the State Collector cannot be abridged or enlarged by ordinance, but if Ordinance No. 42 is otherwise valid, it is not, in my opinton, wholly void as to the Collector of State taxes. *The act of appointment* would be good, and the ordinance be void only as to the excess of one year in the term. It is well settled that if a municipal charter, or the Constitution, prescribes a fixed term of office, an appointment under an Act of Assembly or ordinance which provides for a *shorter* term, is good, and only *the limitation on the term* is void. The appointment would be good for the full term. *Stadler* v. *Detroit*, 13 Mich. 346 ; *People* v. *Rosborough*, 14 Cal. 180 ; *State* v. *Brady*, 42 Ohio, 507.

If, therefore, the statutory term of the collector were two years, and he were appointed under an ordinance which prescribed a term of but one year, the appointment would be good for the statutory term, and the ordinance void only as to its limitation. I can see no reason why the same rule of construction should not apply in this case, and I therefore think that the act of appointment under such an ordinance as this would be good for the stautory term, and the ordinance void only so far as it attempted to enlarge such term. In *People* v. *Tyrrell*, 87 Cal. 475, the Governor had the power of appointment to a certain office until the end of the next session of the Legislature ; he appointed for a term of four years, and it was held that the appointment was good for the period he had the power to fill, and void only as to the enlargement. See also *Hartshorne* v. *Schoff*, 51 N. H. 316.

I do not concur with respondent as to the depository of the power to appoint the Collector of State taxes. It is not conferred upon "the Mayor and City Council" to be exercised only by the joint participation of each in the act of appointment, and no question of delegation arises. It is a power conferred upon "the Mayor and City Council of Baltimore," that is, upon the body corporate, and like other corporate powers, it can be exercised only by means of an ordinance duly passed. *Mayor* v. *Porter*, 18 Md. 300. And so the ordinances have always provided how the State Collector should be appointed.

Nor can I agree with counsel for respondent as to the effect of the Governor's appointment to the office of the Collector of State taxes, on the right of the petitioner to the office of Collector of city taxes. If he was duly appointed to both offices, it would be a case of unusual hardship, should he be unable to secure even one of them, because the action of respondent has caused him to lose the other. A much more important consideration would be that the city of Baltimore should not be deprived of its right to have its own Collector of city taxes, because the Governor has appointed a State Collector.

The duties of these two offices, however, as has been already shown while speaking of their establishment, are not so interwoven as that they cannot be filled by different persons. The law as to the duties of the Collector of city taxes is to-day just what it was under the ordinance of 1862, and as to the Collector of State taxes, it is substantially what it was under the Code of 1860. I therefore do not see how it can be profitably argued that these two offices are inseparable, in the face of the fact, that for three years under the Act of 1865, *they were separated*. The only reason why they are not separated now, is because Governor Lowndes saw fit to appoint Mr. Hopkins as State Collector at a time when he was holding over as Collector of city taxes. As the two offices are separable, the action of the Governor does not affect any right the petitioner may

have to the office of Collector of city taxes, nor would such right be affected, even if this ordinance were void as to the appointment of State Collector.

We come then to the consideration of the validity of this ordinance as applicable to a municipal office, and the controlling questions are: Is it invalid because it provides for the appointment of a Collector of city taxes, by a convention of both Branches of the City Council? If not, was it duly passed over the veto of the Mayor.

At or about the time of the passage of this ordinance, a number of others were passed in like manner over the veto of the Mayor, providing that nearly all the appointments heretofore made on the nomination of the Mayor, should hereafter be made by a convention of both branches. This community for many years has been accustomed to see the larger part of its principal municipal officers appointed on the nomination of the Mayor, subject to confirmation, and it is not a matter of surprise that the proposed abrupt and radical change of policy should have excited much public comment, or that the respondent should have looked upon it as an attack upon the powers of the Mayor, and have characterized this ordinance as part of a revolutionary scheme to deprive him of a right to participate in the appointment to the offices in question.

My province, however, is simply to construe certain provisions of the city charter, and in determining whether or not this ordinance is valid under the terms of the charter, I have nothing to do with the relations then existing between the City Council and the Mayor, nor have I any more right to inquire into the motives of the City Council in passing it, than I have to question the motives of the Mayor when he vetoed it. The powers of the Mayor and City Council of Baltimore, except as to the creation of debt or people of the city's credit, are just such as the Legislature sees proper to make them, and if this ordinance has been lawfully passed in the exercise of a power which, by reason of changed conditions, growth of population, or otherwise,

should no longer be possessed, the remedy is with the Legislature. But if thus lawfully passed, it cannot be revolutionary, and if the Mayor has no such vested right, as is claimed, he is, of course, not deprived of any such right.

On the first inquiry the respondent contends that the *power of appointment* to all city offices is vested under the charter in the " Mayor and City Council ;"that *each* is as necessary constituent, and *each* has the right to participate in the act of appointment to every office ; also that section 30 of Article 4, P. L. L., does nothing more than confer the power to regulate the *manner of the exercise* of the power of appointment, *the depository* of which is the Mayor and City Council as distinguished from the body corporate.

In my opinion neither is a necessary factor in the act of appointment, and the proposition of respondent cannot be maintained. If the Mayor has such a right as is claimed, it must be found in the charter, for his office is statutory and all his powers and duties depend on the provisions of the charter. There are no powers inherent in the office. 1 *Dill.*, sec. 208.

The statute which provides for appointments to municipal office is section 30 of Article 4, P. L. L., viz : " They (that is the Mayor and City Council of Baltimore) may pass ordinances regulating the manner of appointing persons to office under the corporation, which they are or may be authorized by law to appoint, but *unless such ordinances be passed*, the Mayor shall nominate and, by and with the advice and consent of a convention of the two Branches of the City Council, shall appoint all officers under the corporation, except the Register of the city and the clerks employed by the city or under its authority ; the Register shall be appointed by a convention of the two Branches of the City Council," &c.

This section is a codification of the Act of 1817, ch. 148, sec. 2, and of the Act passed March 6th, 1829 (Acts 1828-9, ch. 114). But for the earnest argument on behalf of the respondent, it would not have occurred to me that this section could mean anything else than what on its face it

would seem to purport, that is, that, except as to the Register and clerks, the corporation may provide by ordinances how, and by what municipal agency, all city officers shall be appointed, but that *in case of failure so to provide,* the manner or mode of appointment shall be on the nomination of the Mayor, subject to the confirmation of the City Council in joint convention.

The Mayor and City Council have so construed this power ever since the Act of 1828-9, and that such is its true construction has never, so far as I know, been questioned before. Since that act neither the Mayor or the City Council has been a necessary constituent in the act of appointment to office. The whole subject-matter was then transferred to the municipal corporation, to be provided for by ordinance in the discretion of its legislative department. It can hardly be necessary to say that the approval of the Mayor to any such ordinance is not a necessary requisite. Any ordinance duly passed over his veto is, of course, as much an ordinance of the Mayor and City Council of Baltimore as if it had received his signature.

A reference to previous legislation confirms this construction of section 30. Under the original charter, Act 1796, ch. 68, sec. 8, the Mayor participated to only a very limited extent in appointments. The Second Branch nominated two persons to each office, and the right of the Mayor was restricted to a choice between the two names submitted. Under Act 1807, ch. 152, the nominations were made jointly by both branches, the Mayor still being required to accept one or the other of the two persons thus nominated. By Act 1817, ch. 148, sec. 2, it was provided that all officers except the Register and clerks should be appointed on the nomination of the Mayor, subject to confirmation by a convention of the two branches.

Thus far the Legislature had always regulated the manner of municipal appointments, and the Mayor was not only a necessary constituent in the act of appointment, but under the Act of 1817 (with the exceptions named) not an office

could be filled except on his nomination.   Under this state of
the law an appeal was made to the General Assembly by
joint resolution of the Mayor and City Council of 1829, No.
16, to so change the charter as to empower the *"corporation"*
to pass ordinances regulating the manner of appointing city
officers, and in pursuance of this request the Act of that year
(1828-9, ch. 114) was passed, providing that " the Mayor
and City Council of Baltimore may pass ordinances regu-
lating the manner of appointing persons to office under
said corporation which they are now or may hereafter be
authorized to appoint, anything in the second section of the
Act (of 1817) to which this is a supplement, to the con-
trary notwithstanding."   The Act of 1817 having thus
been subordinated to that of 1828, but not repealed, sec-
tion thirty is, and ever since 1860 has been recognized by
the Legislature as, a correct codification of both in their re-
lation to each other.   The Act of 1828 gave ample power
to the corporation to determine by ordinance how appoint-
ments should be made ; if the corporation in any instance
fails to provide its own manner of appointment, then, but
only in case of such failure, the manner prescribed by the
Act of 1817 obtains.   This construction of the law has
stood unquestioned for nearly seventy years.

It thus appears that during the first twenty-one years of
the city's incorporation the predominating factor in appoint-
ments was either the Second Branch or the joint conven-
tion ; during the next twelve years it was the Mayor ; but
during the whole history of the city there has been no
period, except during these twelve years, when the charter
provided that the appointments should be made on the
nomination of the Mayor.   Prior to the Act of 1828 the
charter had always determined the manner in which city
officers should be appointed, and the obvious meaning of
the Act was to let the corporation through its governing
body determine this matter for itself.   At the time of the
passage of this Act both the Mayor and City Council were
necessary constituents in the act of appointment.   If it was

intended by the Legislature that they should each, or either, continue so to be, as the respondent claims both now are, what possible purpose was there in the passage of the Act?

The respondent contends that the *power of appointment* to office is vested in the "Mayor and City Council," *as separate factors*, under section 29, Art. 4, P. L. L., and that the only power granted by section thirty is the power to "regulate" *the manner of exercising* the power of appointment vested under section twenty-nine, the existence of which, he claims, is recognized in sec. 30 by the use of the word "they." I can find no such power in that section. It provides that "The Mayor and City Council shall have power to pass all ordinances necessary to give effect and operation to all the powers vested in the corporation of the city of Baltimore." This section (read as respondent reads it) thus grants to the Mayor and City Council, as the governing body of the corporation, only the right to *pass ordinances* to carry into effect the powers *vested in the corporation*, and under it the power exists to pass ordinances for the creation of municipal offices; but there is nothing in this section which vests in them the *power of appointment* to such offices.

The contention of respondent that section 29 vests in the Mayor and City Council, as distinguished from the corporate body, the power to pass all ordinances, resting, as it does, altogether on the words in the Code, "Mayor and City Council," is disposed of at once by looking at section 8 of the charter, where it is seen that this power to pass ordinances is conferred on "the corporation aforesaid," and not on the municipal agency through which it acts. The point made that "they" in the following section 30 (relating to appointments) means the Mayor and City Council, as distinguished from the corporate body, because "they" has immediate reference to the words used in section 29, also falls to the ground because it appears from the charter that the words used in section 29 do not refer to the Mayor

and City Council, as distinct from the body corporate, but
to the "aforesaid corporation." And, again, while the Code
begins section 30 with the words, "They" may pass, &c.,
the words of the Act (1828) are, that "the Mayor and City
Council of Baltimore "may pass," &c., and the word "they"
means the corporation. The contention that the words
"they may pass ordinances regulating the manner of appoint-
ing persons to office * * * which *they* are or may be
authorized to appoint," refer to the Mayor and City Coun-
cil as possessing the appointing power is manifestly unsound.
The "they" authorized to appoint are the *same* "they"
in which is vested the power to *pass ordinances.* The joint
resolution referred to shows that the appeal of the munici-
pality was that the Legislature would empower the "*corpora-
tion*" to pass ordinances in this connection, and not only
does it appear from the reference just made to the charter
that the power to pass ordinances is vested in the corpora-
tion, but the power to pass by-laws and ordinances is recog-
nized by all municipal law as a corporate power, vested
always in the body corporate. The Mayor and City Coun
cil may be the agency through which the power is exercised,
but they are never the depository of the power. The
ordinances passed are ordinances of the *municipality,* not of
the councilmen, aldermen, or trustees, who compose the
legislative body which passes them. The "they" referred
to as authorized to appoint can therefore mean only the
corporation, because it is the corporation in which is vested
the power to pass ordinances. The corporation is repeatedly
referred to throughout the statutes and reports by the word
"they" as well as "it."

It is to be noticed that, in the effort to maintain his posi-
tion, that the Mayor and City Council are each constituent
factors in the act of appointment, the respondent finds it
necessary to insist that the corporate power to pass ordi-
nances to give effect to the powers vested in the corpora-
tion, and the corporate power to regulate the manner of
appointments, are vested in "*the Mayor and City Council,*"

as distinguished from the body corporate, the name of which is " The Mayor and City Council of Baltimore," and the constituents of which are the inhabitants of the city. I have shown that even by accepting such construction, nothing more results than to show the existence in " The Mayor and City Council " of a power, not to participate jointly in making appointments, but only to provide by ordinance for carrying into effect the powers of the corporation. There are, however, no corporate powers vested in the " *Mayor and City Council*." The whole argument of respondent rests on nothing but the abbreviations of " The Mayor and City Council of Baltimore " into " The Mayor and City Council," or into " they," made in the course of codification. Such an interpretation as respondent contends for, if applied to the numerous similar instances of abbreviation to be found in the Code, would disintegrate the body politic as established by the charter, and transfer some of the most important corporate powers to a mere agency of the corporate body.

A reference to the charter and its amendments will show that the powers to pass ordinances and to provide for appointments, like the powers to tax, to preserve the public health, to establish a fire department, and so forth, are vested in " The Mayor and City Council of Baltimore," the body corporate, and the City Council and the Mayor in his legislative capacity, are simply the municipal agency through which these powers are exercised.

While it may be conceded that sec. 30 confers the power only to pass ordinances regulating the "manner" of appointment, the respondent has altogether failed to show any provision of the charter which makes the Mayor and City Council the depository of the *power of appointment.*

I accept the distinction made by the respondent between *the power* of appointment, and the *manner of exercising* such power, as well as the rule of law that in regulating the manner of its exercise, the principal power must not be subverted ; but *the depository* of the *power of appointment* is

unquestionably the *body corporate.* The Legislature regulated the *manner of its exercise* until 1828, and then transferred this reserved right to the corporation. The ordinance now in question simply determines the manner in which the corporate power of appointment shall be exercised in respect to the City Collector.

The power *to create* offices is not only absolutely essential to the execution of the powers and the accomplishment of the purposes of this municipal corporation, but the existence of the power is expressly recognized in the charter (secs. 7, 9, 10), and therefore exists just as clearly as if conferred in express terms. 1 *Dillon,* sec. 89.

The power to fill the offices created is just as essential to the purposes of the corporation as the power to create them. Having beyond all question the power to create offices, what would such power amount to unless it implied or included the power to fill them? What else could the power of appointment to offices created by the corporation be, except a corporate power, and if a corporate power its depository is necessarily the corporate body.

But while the Legislature conferred on the city the power to create offices and the power to make appointments to fill them, it nevertheless was competent for it to reserve the right to *regulate the manner of exercising* the power of appointment by the corporation, and to say *how* it should be done. This is just what the Legislature did do, and is all that it did; while it conferred the principal power to create offices and to fill them, it reserved during the earlier years the power to regulate the manner of filling them. The depository of *the power* to elect the Mayor is none the less. the body corporate because the manner of his election is regulated by statute, and so the depository of the *power of appointment* is the corporation, although the Legislature saw proper until 1828 to say *how* appointments should be made.

The very Act of 1828 under consideration (sec. 230), as heretofore shown, distinctly recognizes the corporation as the depository of the power of appointment. It recognizes

the power of appointment as being in the *same body* in which is vested the power to pass ordinances. It is impossible to think of this corporate power to pass ordinances as being vested anywhere but in the corporate body.

And thus in 1796 the Legislature, while conferring the power of appointment, provided that the *manner of its exercise* should be by the nomination of two names by the Second Branch, from which the Mayor should select one. In 1807 it saw proper to change this manner of appointment and provided for the nomination of the two names by a joint convention. Another change in the manner was made in 1817 when it was provided that nominations should be made by the Mayor to the joint convention, and in 1828, after the Legislature had been regulating the manner of appointments for nearly thirty years, and evidently to the dissatisfaction of the people, if not to the injury of corporate interests, the Act was passed providing that the corporation itself might (with a few exceptions named) regulate the manner of appointments to municipal offices, the manner provided for by the Act of 1817 remaining operative only as a guard against failure or omissions on the part of the corporation to pass ordinances.

All these Acts prior to 1828 were simply in execution of the right reserved to regulate the manner of exercising the power of appointment, which was vested in the corporate body. The Legislature was not constantly shifting the depository of the principal power; it was simply changing the manner of its exercise. If I am wrong in this construction of the Act of 1828, why, I may ask again, was it ever passed? To say that it gave to the corporation the privilege of providing that the vote in joint convention should be by ayes and nays instead of by ballot, or the right to return to either one of the discarded modes of appointment, or to provide that confirmation should be by each branch separately instead of in joint convention, is to give the most inadequate explanation of the protest of the municipality against the then existing law and of the prompt-

ness of the Legislature in changing it. That the city government should unite in an appeal to the Legislature merely for the accomplishment of such trivial results as suggested, is inconceivable. If the construction of the respondent be right, it practically wipes out the Act of 1828, and the law was not worth the trouble of its passage.

Municipal legislation further shows the uniform construction given to the Act of 1828. Taking the City Code of 1893, it will be found that there is not a single city office, the manner of appointment to which is not provided for by ordinance. There is not an appointment or nomination to office made by the Mayor, which some ordinance does not authorize him to make.

Still referring to the Code of 1893, the different modes of appointment therein provided for, show that it has never been supposed since 1829, that the statute law required the concurrence of the Mayor and City Council in the act of appointment, or that it made either of them a necessary constituent in such act. The following instances point out the different modes of appointment. The Mayor alone appoints the six superintendents of lamps and the commissioners of all public squares; the appointments under the Health Board are made by the Board, subject to the approval of the Mayor alone; the Assistant Librarian is appointed by the Librarian, subject to the approval of the Mayor; and the one hundred and twenty-three lamplighters are appointed by the Mayor alone. The men who hold the humble positions last-named have their fixed term, take the oath of office, and are exempted from bond only by virtue of a special ordinance.

On the other hand, the public school commissioners and the public printer are appointed by a joint convention of both branches, and under Ordinance 1833, No. 16, the Commissioners of Finance were appointed in like manner and continued so to be until a few years ago.

But some of the most important officers of the city are appointed by heads of departments, or municipal boards,

without the participation of either the Mayor or City Coun-
cil, among whom are the following, viz. : The Water Reg-
istrar, the Water Engineer, the Deputy Comptroller, the
Deputy Register, the Chief and Assistant Engineers, and
Superintendents of the Fire Department, the Engineer of
the Harbor Board, the Superintendent of the Public Schools,
and the Assistant, the Deputy City Collector, and twenty
or thirty Bailiffs and Assessors.   In some instances also the
appointments have been made by the ordinances which cre-
ated the office.

From this examination of the law the ordinance in ques-
tion, in my opinion, is not invalid on the ground that it
provides for the appointment by a convention of both
branches of the City Council of a City Collector charged
with the duty of collecting city taxes.   Its validity, so far
as it relates to the appointment of a City Collector of State
taxes, is not involved in this case.

I feel confirmed in the correctness of the view I have ex-
pressed by the opinion of the Court of Appeals in affirm-
ing the order dismissing the petition.   As stated this trial
was begun under the order *per curiam* remanding the case
in order that "further proceedings" might be had to bring
the case to trial on its merits, and the opinion of the Court
of Appeals was not received until near the close of the argu-
ment of counsel.   This opinion shows that the Court fully
considered the fact that the demurrer mounted, and states
that it therefore was necessary that "*the petition* as well as
the answer, *must be carefully scrutinized.*"   In thus scrutin-
izing the petition, attention is called to the insufficient alle-
gation in respect to the veto vote, which, the Court says,
makes the petition defective on its face, but there is no sug-
gestion of any other insufficiency.   The mounting of the
demurrer certainly presented also the question of *ultra vires*
touching the ordinance set out and relied on in the petition,
the power to pass which was repeatedly denied in the an-
swer, and as the Court has remanded the case for trial on
its merits after having scrutinized the petition, with a ref-

crence only to the insufficiency referred to, I cannot infer otherwise than that the Court saw no obstacle to the plaintiff's claim in the defence of *ultra vires*. This inference is confirmed by other language of the opinion. The Court further says, in exercising its power to remand, viz., "the merits of the controversy have never been passed upon by the Court, *nor has the cause ever been in a condition that they could be passed upon,* and not to remand it would be neither more or less than a denial of justice."

In view of this language I do not see how a trial on the merits can mean anything more than a trial on the facts with such incidental questions of law as might arise thereon, because the ordinance in question being fully set out in the petition, the defence of *ultra vires* being set up in the answer, and the demurrer mounting, the case certainly has been in a condition in which the question of *ultra vires* might have been passed on. No "further proceedings" were necessary in order to present that question, and it would seem, therefore, that the purpose of the remand must have been the trial of other matters.

The next inquiry is, was this ordinance duly passed over the veto of the Mayor? The Charter, Art. 4, sec. 13, P. L. L., provides that: "All ordinances passed by the City Council shall be sent to the Mayor for his approbation, and when approved by him shall become a law; but if the Mayor shall not approve of any ordinance he shall return the same within five days, with his reasons in writing therefor, and if three-fourths *of both branches* of the City Council on consideration thereof approve of the ordinance, it shall then be an ordinance to all intents and purposes." " Both branches," of course, means *each* branch acting separately, and not in joint convention. *Baltimore* v. *Kirkley,* 29 Md. 107.

It appears by the journal of the First Branch that, when this ordinance was put on its passage after the veto, three members were absent, and, of the nineteen members present, fifteen voted in favor of its passage and four against it. From the journal of the Second Branch it appears that two

members were absent, and of the nine present seven voted
in favor of the ordinance and two against it.   The ordinance,
therefore, received the vote of three-fourths of the members
present in each branch, but not three-fourths of all the
members of either branch.   Did it receive the vote of three-
fourths of each "*branch?*"

The meaning of three-fourths of "the branch" has been
practically settled by the Court of Appeals and is not open
to serious controversy.   Whatever may be the total num-
ber of a legislative body, such body is in legal session when
a quorum of its members are duly assembled.   Such quorum
is the legal body and is recognized as the "Branch," the
"House," or the "Board," as the case may be.   The Court
of Appeals in *Heiskell* v. *Mayor*, 65 Md. 149, defines a
quorum as "that number of the body which, when assem-
bled in their proper place, will enable them to transact their
proper business, or, in other words, that number that makes
the lawful body, and gives them the power to pass a law or
ordinance."   In *United States* v. *Ballin*, 144 U. S. 5, with
reference to the House of Representatives, it is said that,
with the presence of a quorum, "the House was author-
ized to transact any and all business."   Also, viz. : "The
general rule of all parliamentary bodies is that when a
quorum is present the act of the majority of the quorum is
the act of the body"—*ib.* 6.   That the quorum constitutes
the legal body, see also *State* v. *Porter*, 113 Ind. 82 ;
*Barnet* v. *Patterson*, 48 N. J. L. 400.

It thus being established that the members present, pro-
vided there be at least a quorum, constitute the legal body,
with full power, in the absence of any limitation imposed
by superior authority, to transact all business, it is necessary
only to refer again to *Heiskell* v. *Mayor*, which decides that
a majority of its members constitutes a quorum of each
branch, that is to say, constitutes "the branch."   The
question is thus settled.   There having been more than a
quorum present in each branch at the time this ordinance
was put on its passage after the veto, it is manifest from the

figures that it received the approval of three-fourths of each " Branch," and was duly passed over the veto of the Mayor..

Had the provision been such, for instance, as is found in the Constitution of Maryland with reference to passing a bill over the veto of the Governor, which requires a vote of three-fifths " *of the members elected*" to each House, or had it been similar in terms to the provision of the charter in respect to the expulsion by either branch of a member, which requires a vote of three-fourths " *of the whole*" of the members, the vote would not have been sufficient. But, apart from authorities cited, the different terms used in respect to the vote required in the case of expulsion and in the case of a veto (which are the only cases in which a vote greater than a majority is required), show that the Legislature did not mean to require the same vote in each case.    It may be added that not a single authority was submitted on behalf of respondent in conflict with the construction now given to the requirement of a three-fourths vote of the " Branch," and while it was controverted, as applied to an ordinance relating to the matter of appointment to office, it was conceded that a vote of three-fourths of the members present, there being a quorum, was all that was necessary to overcome a veto of any other kind of ordinance.

The law is clearly stated by JUDGE COOLEY, viz. : " A simple majority of a quorum is sufficient, unless the Constitution establishes some other rule ; and where, by the Constitution, a two-thirds or three-fourths vote is made essential to the passage of any particular class of bills, two-thirds or three-fourths of a quorum will be understood, unless the terms employed clearly indicate that this proportion of all the members, or of all those elected, is intended." *Const. Lim.*, p. 168.    That three-fourths of the " Branch," or of the " House," means three-fourths of the members present, there being not less than a quorum ; see also *Green* v. *Weller*, 32 Miss. 650 ; *Southworth* v. *Palmyra R. R.*, 2 Mich. 287 ; *Morton* v. *Comptroller*, 4 So. Car. 462 ; *State* v. *McBride*, 4 Mo. 303, and *Warnock* v. *City of Lafayette*, 4 La. Ann. 419.

This ordinance, therefore, being valid so far as it relates to the appointment, in the manner provided, to the office involved in these proceedings, and having been duly passed over the veto of the Mayor, it becomes the duty of the respondent to administer to the petitioner the oath of office prescribed by ordinance for municipal officers, and the petitioner is entitled to the writ of *mandamus* as prayed."

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE and RUSSUM, J. J.

*Thomas G. Hayes, City Counsellor*, and *Thomas Ireland Elliott, City Solicitor*, for the appellant.

I. *The Court below erred in the following rulings :*

(*a*). Article 60, section 5, Code Public General Laws, title "*Mandamus*," provides that the petitioner shall file a plea or traverse to the respondent's answer, " and the defendant shall take issue or demur within five days thereafter." After this case was remanded under the first appeal in *Creager* v. *Hooper*, 83 Md. 203, the petitioner amended his petition and the respondent filed an amended answer setting up sundry additional defences. To the amended answer the petitioner filed certain exceptions, which were set down for hearing. After argument on the exceptions to the answer, the Court sustained some of the exceptions and overruled others. The petitioner, immediately upon this action of the Court on the exceptions, filed his traverses to the answer; serving copies of the same on the respondent's counsel at the trial table, who for the first time saw them. The respondent, though his counsel demanded the five days under the above provision of Article 60, section 5, to decide whether he would take issue or demur to the traverses. The Court refused the request of the respondent, and required him at once to take issue or demur to the traverses of the petitioner and go to trial, although the case had not been assigned for trial. The respondent then filed his joinder of

issue to the traverses to his answer, and the case proceeded to trial.

The right conferred on the respondent by Article 60, section 5, P. G. L., to be allowed five days to take issue or demur to the traverses of the petitioner, was one conferred by law, and of which he could not be deprived by the Court by its ruling to abrogate or repeal a statute passed by the General Assembly of Maryland. The respondent was in Court on the exceptions, and not for trial on the merits.

(*b*). This case, under the decision of this Court, in *Creager* v. *Hooper, supra,* was remanded for trial on its merits. A *per curiam* order was passed by this Court, with a statement in it that the opinion of the Court would be afterwards filed. Before this opinion was filed, either in this or the lower Court, the lower Court on application of the petitioner, proceeded to the trial of the case. The respondent insisted that the case was not ready for trial, as the Court nor parties were advised as to the *opinion* of the Court of Appeals on the question presented on the first appeal, as only their judgment, as contained in the *per curiam* order had been filed, and no opinion had been yet delivered. The respondent, in support of his contention, relied on rule 8 of the Court of Appeals, which provides:

"A certified copy of the *opinion* and judgment of the Court of Appeals shall be transmitted forthwith to the Court from which the appeal was taken, *to the end that said cause may be again tried, as if it never had been tried.*"

(*c*). In sustaining the exceptions to certain paragraphs of the amended answer, the lower Court deprived the appellant of substantial defences to the action. Ordinance No. 43, 1895–96, the ordinance providing for the election of City Collector by a joint convention of both branches of the City Council, was claimed, in two of the paragraphs stricken out under the exceptions, to be void in whole or in part in the following respects: 1st. The condition of the bond to be given by the City Collector before entering upon the discharge of his duties, was set out in the ordinance, which

condition was materially different from the condition pre-
scribed in Article 81, section 32, Code P. G. L.   2d. The
ordinance permitted the collector's bond to be approved by
the presidents of the two branches of the City Council,
while Article 81, section 31, Code of P. G. L., made the
approval of the Mayor necessary.   These void provisions
were inseparably connected with the other portions of the
ordinance, and hence the entire ordinance was void. *Berry
v. Balto & D. Pt. R. Co.,* 41 Md. 465 ; *Austin & Murry,* 16
Pick. 121 ; *Second Municipality v. Morgan,* 1 La. An. 111 ;
*Trade Mark cases,* 100 U. S. 95.

Another paragraph of answer averred that the appellee
before presenting his official bond for approval by the ap-
pellant had failed to comply with Article 13, sec. 4, of the
Baltimore City Code, which required the City Solicitor to
approve the legal sufficiency as to form of all official bonds.
The Court struck out this paragraph upon the ground that
the prayer of the petition was not to require the appellant
to approve the bond of the appellee but to administer to him
the oath of office.

Another paragraph of answer which was stricken out un-
der the exception, averred that under Article 81, sec. 37,
Code P. G. L., the appellee had forfeited the office of City
Collector, as within twenty days from his appointment he
had not tendered a good and sufficient bond as to condi-
tion or legal sufficiency of form as required by said section.
The language of the section justified the claim of forfeiture
of the office and hence the appellee was not entitled to the
writ of *mandamus,* as it would be nugatory. *Archer v. State,*
74 Md. 448 ; *Stephens v. Crawford,* 1 Ga. 574 ; *Creighton
v. Com.,* 83 Ky. 145 ; *Falcon v. Shares,* 37 Ark. 391 ; *State
v. Johnson,* 100 Ind. 490 ; *People v. Perkins,* 85 Col. 511.

(*d*). The Court erred in permitting a witness on behalf
of the appellee to prove a practice to the effect that the
journals of the City Council were not deposited in the office
of Register until the final adjournment of the City Council,
which journals were required by Article 1, sec. 20, Balti-

more City Code, to be kept by the Register, and said section further provided that he should furnish certified copies of same at any time, and under this ruling the journals were admitted in evidence without the required certificate of the Register as required by Article 1, sec. 62, of Baltimore City Code.

(*e*). This Court in remanding the case on first appeal to be tried on its merits decided that the issues in the case related to the validity of the ordinance in question and that these issues were for the Court to try and decide and not the jury. The pleadings were all framed with a tender of issue to be "enquired of by the Court." Nevertheless the Court under instructions submitted the case to a jury and on the verdict of the jury the Court ordered the final judgment. On this verdict of the jury and judgment the order was passed directing the *mandamus* to issue.

II. *Ordinance No. 42 is ultra vires, void and inoperative, and there was no duty imposed on the appellant by said ordinance to administer to the appellee the oath of office as City Collector.*

Where is deposited the power of appointment to office under the charter of Baltimore? The Constitution, Art. 11, and sections 7 to 29 of Art. 4, P. L. L., clearly show that the governing body of the municipal corporation is the Mayor and City Council. The office of Mayor, under the Constitution and laws, is one of great responsibility. He is not an integral part of the City Council, as in the case of most English municipal corporations and many American municipalities, but the executive head of a great city, and a distinct, independent and co-ordinate branch of the city government. His duties are both legislative and executive; in the approval or disapproval of ordinances, it is legislative; and in the matter of appointments to office and executing ordinances, it is executive. In the performance of both of these functions, he is, under the Constitution of the State and charter of the city, as essential a factor or constituent of the municipal government as the City Council, the other independent and co-ordinate department.

There are incident to every corporation, both private and public, two things: 1. A name or style of the corporate entity; and, 2. A governing body also properly designated. In private corporations the governing body is usually the president and directors. In the case of Baltimore City, the Constitution names the governing body as the " Mayor " and " City Council," while the law (Code P. L. L., Art. 4, sec 1), gives as the corporate name " Mayor and City Council of Baltimore." This name may be changed at the pleasure of the Legislature, but as long as the present Constitution exists, the Legislature cannot deprive the people of Baltimore of a municipal government consisting of two independent and co-ordinate branches, a Mayor, or equivalent head, with a City Council or its equivalent, because this Court has said in 15 Md. 387, that " The franchise of gov - erning the city through the instrumentality of a Mayor and City Council is secured and recognized by the Constitution."

We might be contented to rest the case of the appellant as to the illegality of the ordinance upon the fact that, inasmuch as the Mayor is one of the *instrumentalities* of the city government secured by the Constitution, he is, therefore, necessarily an essential participant in all governmental matters relating to the municipality, especially those which particularly partake of the nature of an executive character, such as appointment to office, and that any ordinance which deprives him of all voice in appointments of municipal officers, and places his power solely in the City Council, is a violation of the Constitution, which guarantees to the people of Baltimore a government in which the Mayor shall be an instrumentality. To say that when the executive head is deprived of all voice in the matter of the selection of the hands by which he is to execute the ordinances, it is not eliminating the Mayor from a most important function or instrumentality of municipal government and depriving the people of a right they have under the Constitution, can find no support in reason or authority.

The appellant is not contented, however, to rest his case

upon this view alone, but contends that the city charter places in express terms the appointment of all officers, except the Register, in the governing body of the corporation, whom we have seen to be the Mayor and City Council. The *manner* of the exercise of that power by the governing body may be *regulated* in any way the Mayor and City Council by ordinance may choose to declare, but no valid ordinance can be passed which deprives the Mayor or City Council of participation in the matter of appointment of municipal officers.

It must be conceded that before the Act of 1828–29 was passed, the depository of the powers of appointment was clearly defined and put by the charter exclusively in the Mayor and City Council, and the *manner* of its exercise for the third time clearly specified by the Act of 1817, as follows: "The Mayor to nominate and by and with the advice and consent of the two Branches of the City Council to appoint all *officers* under the corporation, except, &c." The Mayor and City Council not desiring to be compelled to have to apply to the Legislature every time they desired to regulate or change the *manner* of appointment of officers, as twice before they had been required to do, without any change in the depository of the power, passed on February 19, 1829, the following joint resolution, which was approved on said date by Jacob Small, Mayor: " Resolved, &c., That the delegates from the city of Baltimore in the General Assembly of Maryland, be and they are hereby requested to procure such an alteration of the charter as will empower the corporation to pass ordinances *regulating the manner* of appointing *officers* under the corporation." The Legislature, upon the receipt of the joint resolution passed on March 6, 1829, the Act of 1828–29, chap. 114, which was as follows: " That the Mayor and City Council may pass ordinances regulating the manner of appointing persons to office under said corporation which they are now or may hereafter be authorized by law to appoint; anything in the second section of

the Act (1817, chap. 148), to which this is a supplement, to the contrary notwithstanding."

If the Legislature had intended to confer this power of transferring to anybody this power of appointment which had for 33 years been deposited in the governing body of the city, why did they not use some term other than "regulate the manner" for the accomplishment of its purpose? Each of the words, "regulate" and "manner," has its well-recognized legal meaning. They never mean to "prescribe," "decree" or "ordain." The phrase formed by coupling these words together—"regulating the manner"—when used in connection with appointments to office, has a well-recognized meaning and has been repeatedly judicially determined to mean the "time" or "mode" of making appointment. The power to "regulate the manner" of making appointments confers no power either to alter or delegate the pre-existing power of making appointments—the depository of the power and its exercise remain the same while the time, mode or method of exercising the power by the depository of the power may be changed. This proposition is fully supported by the following authorities: 19 *Am. & E. Ency. of Law*, 421; *Mechem, Public Officers*, sec. 107; *Yick Wo* v. *Hopkins*, 118 U. S. 356; *Brown* v. *O'Connell*, 36 Conn. 432; *Jones* v. *Perry*, 10 Yerger, 59; *State* v. *Kenum*, 7 Ohio St. 560; *Wells* v. *Bain*, 75 Pa. St. 39; *State* v. *Denny*, 118 Ind. 382; 4 *L. R. A.* 79; *Evansville* v. *Bland*, 118 Ind. 426; 4 *L. R. A.* 93; *Holt* v. *Denny*, 118 Ind. 449; 4 *L. R. A.* 65; *Trowbridge* v. *Newark*, 46 N. J. L. 144.

Having endeavored to show, 1st, that the governing body of the city under the Constitution and law is the Mayor and City Council, and 2ndly, that the power of appointment by the Act of 1817 is in the governing body and that the effect of the Act of 1828–29 is not to disturb the depository of the power, but only to regulate the manner of its exercise, we next submit that this power cannot be delegated as is attempted by the ordinances in question. The power is a trust committed to the depository of the

power to be discharged by them and not to be exercised by even one of the co-ordinate branches, acting separately; the power must be performed by their joint or concurrent action." 1 *Dillon on Municipal Corp.*, sec. 96; 15 *Am. & E. Ency.* 1042; *Weeks* v. *Dennett*, 62 N. H. 2; *State* v. *Fiske*, 9 R. I. 96; *East St. Louis* v. *Wehrung*, 50 Ill. 31; *Day* v. *Green*, 4 Cush. 433; *Lowenstein* v. *Fon du Lac*, 28 Wis. 338; *Com.* v. *Crogan*, 26 Atl. Rep. 697; *St. Louis* v. *Thomas*, 11 Ill. App. 283; *Union Depot* v. *Smith*, 27 Pac. Rep. 329; *Eichenlaub* v. *St. Joseph*, 21 S. W. Rep. 8; *Trenton* v. *Cole*, 107 Md. 194; *Dillard* v. *Webb*, 55 Ala. 468; *Minn. Co.* v. *Minneapolis*, 36 Minn. 159; *Birdsall* v. *Clark*, 73 N. Y. 73; *State* v. *Newark*, 47 N. J. L. 117; *St. Louis* v. *Russell*, 20 L. R. A. 529; *Hitchcock* v. *Galveston*, 96 U. S. 341; *McCrowell* v. *Bristoe*, 20 L. R. A. 653; *Saxton* v. *Beach*, 50 Md. 488; *Kerr* v. *Ross*, 5 App. Cas. D. C. 252; *Scharf* v. *Balto.*, 54 Md. 499.

It is submitted that the following propositions have been fully sustained: 1. That the governing body of the city of Baltimore is the two co-ordinate and independent branches of the Mayor and City Council. 2. That in this governing body is deposited by the Act of 1817 the appointment of all municipal officers, and that the Act of 1828–29 in no wise disturbs this depository of the power of appointment, but only regulates the time, mode and manner of the exercise of the independent and principal power. 3. That the power of appointment of municipal officers is a public trust to be exercised by the Mayor and City Council and cannot be delegated to the City Council.

III. *Ordinance No. 43 of 1895–96 is ultra vires because it was passed in violation of the rules of procedure of the City Council.*

Article 4, section 27, of the Code of Public Local Laws, provides that the City Council "Shall settle their rules of procedure * * * They shall keep a journal of their proceedings and enter the yeas and nays on any question, resolve or ordinance at the request of any member." In compliance

with this power both branches of the City Council adopted rules of procedure, among which were the following:

"Rule II, Section 9. Ordinances, resolutions, &c., sent in from the other branch shall then be presented and read a first time."

"Rule IX. Every ordinance or general resolution before being put on its passage, whether originating in this or received from the other branch, shall have two readings on two separate days unless two-thirds of the members of the branch shall by a vote otherwise direct."

Ordinance No. 43 was passed by both branches in due form, it having originated in the First Branch. After it was engrossed, signed and delivered to the Mayor it was by a message of the First Branch received and amended in a most material part and. passed by the First Branch, and as amended it was sent to the Second Branch. The journal shows the following to be all that took place in the Second Branch upon the receipt of the ordinance:

"Received, also, an amended ordinance entitled an ordinance to repeal sections 31 and 32 of Article 50, Baltimore City Code of 1893, title, 'Taxes,' sub-title, 'City Collector,' and to re-enact the same with amendments."

"On motion of Mr. Henry the vote by which the ordinance was passed in this branch was reconsidered.

"Mr. Harrison moved to concur in the amendment, which was agreed to.

"The question recurring on the passage of the ordinance as amended the same was declared passed and the title read and approved."

It is to be noticed that this ordinance was not read at all in the Second Branch; indeed, there is nothing to show that even the amendment was read except an inference from the fact that the journal says it was "agreed to."

The case presented by the above extract given from the journal is that of an ordinance which it is assumed was passed in due form on the 27th of February, 1896, engrossed and sent to the Mayor for his approval or disapproval, and

before the Mayor had acted upon it, the First Branch, where it originated, by message requests its return. It is returned to the First Branch. The ordinance in a most material part is amended and then repassed and sent not as an amended ordinance but a new ordinance to ·the Second Branch, who pass it without a single reading. The motion made in the Second Branch to " concur in the amendment " made and adopted by the Second Branch is an unheard of motion in parliamentary law. Such a motion is never proper except in the body in which the measure originated and then this is its action on an amendment originating in the body to which the original was sent in its complete form. So we have from the journal this patent fact that the ordinance was completed in its entirety by amendment in First Branch after its return from the Mayor, and it was then sent to the Second Branch for its action and in total disregard of Rule II, section 9, and Rule IX, the Second Branch passed it at once upon its receipt with no reading.

1. The silence of the journal does not justify the presumption that anything was done with respect to the passage of the ordinance but what appears in the journal. *Steckert* v. *Saginaw*, 22 Mich. 104 ; *Tracy* v. *People*, 6 Col. 151.

2. The journals may be examined to ascertain what was done in the passage of a legislative enactment. *Berry* v. *Drum Pt. R. Co.*, 41 Md. 446 ; *Legg* v. *Mayor of Annapolis*, 42 Md. 203 ; *Town of South Ottawa* v. *Perkins*, 94 U. S. 260.

3. The wisdom of the rule requiring an ordinance to be read on separate days is apparent. To prevent haste and to give to the public notice of its contents are among the benefits which result from the observance of such a rule. The fact that the rules of procedure in question which were violated were not incorporated in the city's charter, but adopted by the City Council under the power conferred in Article 4, section 27, Public Local Laws, to " settle their rules of procedure," can make no possible difference as to

their binding force.   Without the charter power thus con-
ferred to adopt rules of procedure it might be said that the
City Council could not *diminish* the power of a majority by
the rules in question, but with the power conferred the rules
are of the same bond of force as if incorporated in the city's
charter.   A violation of these rules in the passage of the
ordinance in question in not having read it in the Second
Branch at all, as well as not having read it on two separate
days, Rule IX not having been suspended renders the ordi-
nance invalid, and *ultra vires.*   *Coleman* v. *Dobbins*, 8
.Ind. 160 ; *Morrison* v. *Lawrence*, 98 Mass. 221 ; *State* v.
*Newark*, 30 N. J. L. 305 ; *State* v. *Hudson*, 29 N. J. L. 50 ;
1 *Dil. M. Corp.*, sec. 288 ; 1 *Beach Corp.* 494 ; *Cush. Law.
Leg. Ass.*, sections 794, 1480, 1491 ;   *Atkins* v. *Phelps*
(Fla.), 8 So. Rep. 430 ; *Armitage* v. *Fisher*, 26 N. Y. Sup.
366 ; 74 Hun. 171; *People* v. *Cahill*, 39 N. Y. Sup. 375 ;
*Whitney* v. *Hudson*, 69 Mich. 202 ; *Greely* v. *Homma*, 17
Col. 34 ; *Swindell* v. *State*, 143 Ind. 153, 42 N. E. Rep.
528 ; *U. S.* v. *Ballin*, 144 U. S. 1.

It does not seem to be an open question in Maryland as
to the necessity of the City Council's complying with its
rules of procedure in order to give validity to its ordi-
nances.   The question arose, was discussed and decided
by this Court in *Heiskell* v. *Baltimore*, 65 Md. 125.

IV.  *Ordinance No. 42 of 1895–96 is ultra vires, because
it was not passed over the Mayor's veto by three-fourths of
both branches of the City Council.*

(Argument on this point omitted).

V.  *The order passed in this cause was that a mandamus
issue compelling the appellant to administer to the appellee the
oath of office as City Collector of City Taxes.   No such de-
mand was made before the filing of the petition in this cause.*

It is an elementary principle of the law relating to
*mandamus*, that a demand must be made upon the person
charged with the performance of the duty, and a refusal to
perform the duty given by such person, before he can by
the extraordinary and prerogative writ of *mandamus* be

compelled to perform the duty.  *Shortt on Mandamus*, 248 ;
*Tapping on Mandamus*, 84 ; *Chance* v. *Temple*, 1 Iowa, 189 ;
*U. S.* v. *Boutwell*, 17 Wall. 604 ; *Com. P. Schools* v. *Allegany Co.*, 20 Md. 460.

Ordinance No. 43 provided for the appointment by the
City Council of a City Collector of both city and State
taxes.  The appellee was elected as such Collector and
demanded of the appellant, before filing his petition, that
he should administer to.him the oath of office for Collector
of both city and State taxes, which was refused.  By reason of the appointment by the Governor of Louis N. Hopkins Collector of State taxes upon the provisions of law,
after the filing of the petition by the appellee he was no
longer entitled to have administered to him the oath of
office as Collector of State taxes.  To meet this changed
condition the prayer of the petitioner was amended and the
order was passed, that a *mandamus* · issue requiring the
appellant to administer to the appellee only the oath of
office as City Collector of city taxes, which had never
been demanded.

VI. *The order passed by the lower Court directing a mandamus to issue required the appellant to administer to the appellee the wrong oath.*

Art. 81, sec. 36, of the Code of Public General Laws
requires " *every Collector* " to take the oath set out in that
section.  The order directing the *mandamus* to issue ignored
this provision of law and required the appellant to administer to the appellee the oath prescribed by a city ordinance
contained in Article 1, section 31, Baltimore City Code of
1893.

VII. *The action of the City Council in depriving the Mayor of all participation in the appointment of all municipal officers was destructive of one of the independent and co-ordinate branches of the city government.*

Ordinance No. 13 of 1895-96 transferred the power of
appointment of every municipal officer into the hands of
the City Council.

Although it is true that appointment to office is not
inherently a right or privilege of the executive branch of
the government, yet to maintain the independence of that
branch there must be left some power to appoint some
officers, which was not done by the City Council, but the
entire corps of municipal officers was by Ordinance No.
13 taken from the Mayor. *Baltimore* v. *Police Board,* 15
Md. 471, 472; 19 *A. & E. Ency. Law,* 418-419; *State* v.
*Noble,* 21 N. E. Rep. 247; *State* v. *Hyde,* 22 N. E. Rep.
648.

*Henry Stockbridge, Jr.,* and *William S. Bryan, Jr.* (with
whom was *Daniel L. Brinton* on the brief), for the appellee.

The motion in arrest states as the reason for arresting
the judgment "because the said judgment would be improvi-
dently entered based upon the verdict of the jury, although
such verdict should have been rendered by the Court."
The jury were sworn because the respondent himself
prayed in his answer a jury trial. He also, in each of his
prayers (except the eleventh, which was a motion to exclude
evidence), prays the Court *to instruct the jury to find* for the
respondent.

And if he could otherwise have obtained any advantage
from the jury being sworn, the fact that he himself was the
cause of it, would estop him from now objecting to it.
*P. W. & B. R. R.* v. *Howard,* 13 Howard, 307; *Davis* v.
*Wakeley,* 156 U. S. 680; *Presstman* v. *Mason,* 68 Md. 89;
*Michaels* v. *Olmstead,* 157 U. S. 201.

But apart from this, the point is not well taken, for
while the questions in this case were undoubtedly for the
Court, without the intervention of a jury (*Lyons* v. *Woods,*
153 U. S. 663, and opinion in former appeal in this case),
and the pleas and traverses show that the appellee so con-
tended, each of them praying that the matter "be enquired
of by the Court," no injury was done to respondent by
having a jury in the box, and the learned Judge in the con-
clusion of his opinion, practically finds that the writ must

be granted to the petitioner.    The presence of the jury was merely an unnecessary formality which harmed no one.

By section 29, Article 4, Public Local Laws, it is provided that "The Mayor and City Council shall have power to pass all ordinances necessary to give effect and operation to all the powers vested in the corporation of the city of Baltimore;" and then, as if that were not full and explicit enough, section 30 provides that "They may pass ordinances regulating the manner of appointing persons to office under the corporation, which they are or may be authorized by law to appoint."

It was sought in the argument below, and the attempt will doubtless be made here to give a construction to the pronoun "they," as meaning the Mayor and City Council as separate and distinct entities, whose joint co-operation is needed alike for the passage of an ordinance or the appointment of individuals to official position.    Such a contention, it is especially submitted, will not stand the test of analysis. The inhabitants of the city of Baltimore are by law the persons constituting the corporation, whose legal title is the "Mayor and City Council of Baltimore."    Neither the executive nor the legislative branch of the municipal government, nor both of these branches combined, constitute the corporation.    It is the people, the inhabitants of the city, who constitute the municipal body, of which the executive and legislative officers are but the agency through which the corporate acts are performed, and the pronoun "they," whatever may be said as to its strict grammatical use, can be referred and referred only to the body corporate, or the plural selected as referring to the population composing the municipal body corporate.    Any other construction than this must end in an absurdity.    To take the view contended for by the appellant, the joint co-operation of both executive and legislative branches of government are essential to the enactment of a valid ordinance ; yet in the very same article, almost in the same section, distinct provision is made as to the method in which valid ordinances

may be enacted, which not merely have not received the sanction of the executive, but which have received his positive and express disapproval, yet the ordinance adopted without his concurrence or approbation is nevertheless a valid and effectual ordinance of the body corporate, binding alike upon the executive and upon every citizen within the limits of the body corporate.

Nor can it be said that the City Council transcended its power when by the enactment of a substitute for section 31 of Article 50 of the Baltimore City Code, it made provision for the choice of a City Collector by the choice of the City Council alone, and that for that reason the ordinance as passed was inoperative and void. Section 30 of Article 4 distinctly recognizes the power in the municipal corporation by ordinance to provide the method, the means, the instrumentality through which the officials of the municipal corporation are to be selected, not merely that, but that such selection may ignore entirely one of the ordinary branches of the municipal government ; for this section of the Public Local Laws makes an express provision as to the manner in which local officials shall be appointed, where no regulation thereof is enacted by the corporation.

The construction contended for by the appellant, the suggestion that the ordinance now before this Court was *ultra vires*—beyond the power of the Council to validly enact, would render meaningless and less than meaningless the concluding paragraph of the 30th section of Article 4. Not merely is this true as an abstract proposition, but it is one which has been recognized for a long series of years in the conduct of the affairs of the municipal body, so that to-day there is no uniformity ; on the contrary, great diversity as to the method by which various municipal officials derive their power. Some acquire it from the Mayor alone, some from the Council alone, some derive theirs from the joint action of these two branches of the government, while others, and a large class, owe their appointment neither to the Council

nor to the executive, but to boards, commissions or various instrumentalities which have been created for the administering of the affairs of the city. Reason and legal interpretation alike therefore support the position of the appellee, that the ordinance adopted was one clearly within the scope and power of the City Council to enact.

If the foregoing proposition is sound the next point for consideration is, were the forms prescribed by law observed in the enactment of this ordinance, so as to render it a valid and effectual ordinance of the Mayor and City Council. The journals of both Branches of the City Council were produced, and the same, in so far as they related to the passage of the ordinance in question, are incorporated in the record. Those journals are and must be the best possible evidence of the proceedings of their respective bodies. They are kept under the authority of the law by sworn officials, as the record of the proceedings, and whenever the journals have the character of records they are admissible as such as proofs of facts therein set out, in the same manner and to the same extent as the records of judicial Courts. *Cushing's Law and Practice of Legislative Assemblies,* sections 426 and 427 ; *Root* v. *King,* 7 Cowen, 636.

They are to be treated as authentic records of proceedings of that body, and the Court may resort to them when the validity of an Act is questioned, upon the ground of the failure of the legislative body to observe a matter of substance in their passage. *State* v. *McClellan,* 18 Neb. 243 ; *McCulloch* v. *State,* 11 Ind. 424 ; *Opinion of Justices,* 52 N. H. 622 ; 1 *Taylor on Evidence,* section 1661 ; *Loomis* v. *Moffit,* 5 Ohio, 363 ; *Happel* v. *Brethaner,* 70 Ill. 166 ; *Gilbert* v. *New Haven,* 40 Conn. 102 ; *Warner* v. *Daniels,* 1 Woodbury & Minor, 90–106 ; *Dunning* v *Roome,* 6 Wendell, 656 ; *Glenn* v. *Orr,* 96 N. C. 415 ; *Power* v. *Athens,* 99 N. Y. 602.

And not only are these the best evidence, but records of this character import an absolute verity, which cannot be varied or contradicted by parol evidence. 2 *Beach on Pub.*

*Corporations,* section 1298 ; *Haven* v. *New Hampshire Asylum,* 13 N. H. 532–535 ; *Gilbert* v. *New Haven,* 40 Conn. 102 ; *Morrison* v. *Lawrence,* 98 Mass. 221 ; *Hoal* v. *Durfee,* 1 Aiken, 286 ; *McCulloch* v. *State,* 11 Indiana, 424.

Objection is sought to be made upon the grounds that the rules adopted by the Council for its own government were not complied with, in that the journal does not show any vote to suspend the rules upon the 2d day of March, when the said ordinance was reconsidered, amended and cast in its final form. The theory of the appellant is that Rule IX of the City Council rules required that, after the ordinance was returned on March 2d, it should have a separate reading upon two separate and distinct days unless there was a suspension of the rules ; that such rule being in force and no motion appearing for the suspension of the rules upon the 2d day of March, the ordinance was invalidly enacted. This contention, however, is without ground to support it, as must appear from the slightest consideration of the practice of legislative assemblies. When a measure is introduced in a legislative assembly, be it Congress, General Assembly, or a municipal Council, it receives its first reading upon the day of its introduction, it is not at that time open to amendment ; it is only when it reaches its second reading, or in cases where by law or rule of procedure three separate readings are provided for, its second or third reading, that amendments can be offered. The ordinance relating to the manner of the appointment of a City Collector received its first reading on February 27th in each branch, and under a suspension of the rules its second reading upon the same day. Upon such second reading, but not until then, it was open to amendment. When, therefore, the measure was returned on March 2d by the Mayor to the First Branch of the City Council, and the motion was made and adopted to reconsider the vote by which it had been passed on the 27th of February, the ordinance then stood as upon its second reading, and as such was properly open to amendment. The ordinance was

amended and passed to the Second Branch of the City
Council.    It was no new ordinance, it had been before the
Second Branch on the 27th of February and had been acted
upon by that branch on that day, and when it reached there
upon the second of March in an amended form it was not
subject to the rule of requiring either a motion of suspen-
sion of the rules for its consideration, or the laying of it
over for action upon a subsequent date.    It is one thing to
amend a bill or an ordinance, and another and very differ-
ent thing to present an entirely new ordinance, and the rule
which is applicable to one has no force as regards the other.

But apart from all this a Court of law will not inquire
into the observance by a legislative body of its own rules.
Such action upon the part of the legislative body is, and
must necessarily be, presumed by the Courts, otherwise it
would inevitably follow that before any act of a Legislature,
or of Congress, or of a City Council, could become valid
and effective, it must be submitted to the Courts, evidence
adduced as to each successive step in the enactment of such
ordinance, and no one could rely or have any faith in the
Acts of the legislative body until such proof had been
affirmatively made.    Not a single Act, either of Congress
or the Legislature, if such a rule obtained, would be
enforcible or observable until the steps of its enactment had
been passed upon by the Courts, and the effect of that
would necessarily be to subject the legislative body to the
control of the Courts, and for the Court to sit, as it were,
upon every ruling of the Speaker or other presiding officer.
This doctrine is often laid down.    See 1 *Wharton on Evi-
dence*, sec. 290 ; *Speer* v. *Plank Road*, 22 Pa. St. 378 ;
*McDonald* v. *State*, 80 Wis. 411 ; *Ry. Co.* v. *Gill*, 54 Ark.
105 ; *Com.* v. *Mayor of Lancaster*, 5 Watts, 153 ; *Magraw*
v. *Whitson*, 69 Iowa, 350 ; *Cooley Court Lim.* 162.

Two suggestions have been made in this connection as
against the validity of the action of the Council.    One of
these is to the effect that the ordinance is delegating that
which is a delegated power, and therefore not within its

proper functions.    This position, it is confidently believed, will not be seriously contended for before this Court.    A body corporate, whether it be a private corporation or a municipal corporation, can act only through its officers and agents, and a power, whether delegated or not, which is to be exercised by the corporation must be exercised through some agency.    The ordinance of the City Council prescribes the agency by which a specified thing is to be done ; it delegates no power, but merely directs how one of its functions is to be performed.   It might as well be said that the ordinance which has long existed, under which the Mayor absolutely and without confirmation by the Council appoints lamplighters, was void and inoperative, because it conferred upon him, or delegated to him, a power already delegated by the General Assembly, or that any other Act which by ordinance is directed to be done in the administration of the corporation by a specified officer or set of officers, was therefore nugatory and void.    Yet in matters relating to the public health, to the schools, to the fire department and other municipal functions, the acts including the selection and appointment of persons to office are by ordinance directed to be performed by certain specified officials of the corporation, yet they have never been construed as any delegation of authority ; it is neither more nor less than prescribing the manner in which any given work or function is to be performed.    The Board of Health, the School Commissioners, or the Fire Commissioners, or the City Council itself, or the Mayor independently of the Council, may by proper ordinance be constituted the agent of the corporation for the performance of any particular service, and such constitution is valid and effectual.    Nor is a contention sound which is sought to be based upon the idea that the present action of the Council destroys any function ; to regulate is not to destroy, and while this ordinance in terms repeals that which had preceded, it re-enacts a provision in the place of that repealed.    Had the Council simply attempted to repeal the provision by which a tax

collector was to be appointed, then they would have put themselves in the position of destroying, but when in the same breath they merely change the method of appointment, that act was not a destroying, but a change of manner, clearly within the terms of the Act of the Legislature.

When a legislative body has conferred upon it the power to prescribe the *manner* in which the public officers shall be appointed, it includes the power to name the agent or person who shall appoint, as well as the formality with which it shall be done. The Constitution of West Virginia provided, "all officers under this Constitution may be removed from office for misconduct, incompetence, neglect of duty, or other causes, in such manner as may be prescribed by general laws," and also that vacancies in office " shall be filled in such manner as may be prescribed by law." The Supreme Court of Appeals of that State, considering the meaning of these sections, said: " The word manner, as used in these two sections, was evidently intended to authorize the Legislature to designate *what tribunal* should exercise the power of removal from office, and who should fill vacancies in office." *Bridges* v. *Shallcross*, 6 West Virginia, 591.

It is no answer to this position to say that there is an inherent right in an executive officer whether of nation, State or municipality to make appointments, or that it violates any principle of the constitution or laws of the State, that such appointments should be made by some other power. This question was distinctly raised, and has been settled for all time in the State of Maryland in the case of *The Mayor and City Council* v. *The Board of Police Commissioners*, 15 Md. 376. See also *Davis* v. *The State*, 7 Md. 161; *Anderson* v. *Baker*, 23 Md. 627; *Warfield* v. *Co. Coms.*, 28 Md. 84.

Nor can an ordinance be held to be unreasonable and *ultra vires* which has been expressly authorized by the Legislature. *The District* v. *Waggaman*, 4 Mackey, 335; 1 *Dillon Municipal Corporations*, sec. 319, p. 316; *A Coal*

*Flat* v. *Jeffersonville*, 112 Indiana, 15 ; *Booth on Street Railway Law*, sec. 223. It is nothing novel for a City Council to choose officers. It is a power well recognized by textwriters. 1 *Beach on Public Corporations*, sec. 163 ; 1 *Dillon on Municipal Corporations*, sec. 212. Directly in point as bearing upon the powers of a City Council to take action, such as was taken in the present case, were the questions that came up for review and consideration in the case of *The Commonwealth* v. *City of Pittsburg*, 14 Pa. State Report, 177-182.

But the appellant seeks to have ordinance in question invalidated upon a number of other grounds, embodied in the prayers, and the first of these was its supposed unreasonableness. See also *Atkins v. Phillips*, 8 Southern Reporter, 42. But where an ordinance is within the powers granted to the municipality in its charter, presumption is that it is reasonable. The judicial power to declare it void, can be exerted only when from the inherent character of the ordinance or from evidence taken showing its operation, it is demonstrated to be unreasonable. *Con. Traction Co.* v. *Elizabeth*, 34 Atlantic Rep. 147 ; and measured by that test, there can be no question as to the reasonableness of the ordinance before the Court. *Paxton* v. *Sweet*, 13 N. J. Law, 196-202 ; *Trenton Horse R. W. Co.* v. *Trenton*, 53 N. J. Law, 140 ; *Pa. R. R. Co.* v. *Jersey City*, 18 Vroom. (47 N. J.) 286.

The most strenuous point of objection, however, to the ordinance, was based upon the following ground : The ordinance in question provided for the appointment of a City Collector, whose duty it should be to collect both city and State taxes, and following the phraseology of the ordinance which it superseded, it provided the term of such officer for. a period of two years ; whereas by section 31 of Article 81, P. G. L., the term of the office of Collector of State taxes for the city and the several counties is annual, instead of biennial ; and by reason of this conflict between the section of the statute and the ordinance involved in this case, the

appellant asks that the entire ordinance may be declared void. Courts are loath, however, to interpose and set aside legislative action, even in cases of apparent conflict. They seek rather to give effect as far as practicable to all legislative enactments, to reconcile as far as possible inconsistent provisions, and when this is impracticable they will declare no more of a statute or ordinance void than the conflict absolutely requires, and if an ordinance be in conflict with the statute in part, and in part only, they will segregate such portions as are in conflict, and set those aside, and sustain the balance.   This principle is fully recognized and adopted in *Trageser* v. *Gray*, 73 Md. 260-1 ; *Hagerstown* v. *Dechert*, 32 Md. 369 ; *Ill. Central R. R. Co.* v. *People*, 43 N. E. Rep. 1107 ; *Payne* v. *Springfield*, 44 N. E. Rep. 105 ; *Cole* v. *People*, 43 N. E. Rep. 607.

McSHERRY, C. J., delivered the opinion of the Court.

It is not necessary to go into any extended statement of the facts presented by this record, nor to discuss the many interesting and ably argued questions which its pages set forth.   With all, except one, of the positions, taken by the eminent and distinguished Judge who heard this case in the Court below, we, in the main, agree, though we are not to be understood as adopting them ; but upon one vital inquiry which was probably not strenuously pressed before him, we reach a different conclusion.   With the policy of the municipal legislation whose validity is assailed in these proceedings this Court has no concern.   If valid, its wisdom is not for us to question.   If invalid, it becomes our plain and imperative duty to declare it so.

The ordinance of the Mayor and City Council, which is attacked on the pending appeal, was passed over the veto of the Mayor, and by its provisions the City Tax Collector was made elective by the joint convention of the two branches of the City Council.   Before the adoption of the ordinance that officer and others had been nominated by the Mayor, and with the advice and consent of a joint convention of

the two branches, appointed.    Whether this radical change
in the method of appointment of the City Tax Collector and
of numerous other *officers* whereby the Mayor was deprived
of all participation in their selection is *ultra vires* or not, is
the predominant and controlling question in the case.

The power to pass ordinances *regulating* the manner of
making appointments to office is a power to regulate the
*method* by which appointments shall be made by the deposi-
tory of the power charged with the duty to make them, but
is not a power to delegate to some one else or to a fraction
of that depository the authority to do the thing which the
depository itself alone was commissioned to do.    The limits
and the scope of the power to make appointments of mu-
nicipal officers were originally defined in the legislation that
has been compressed in *sec.* 30, *Art.* 4, *Code Pub. Local
Laws.*    This section is not new legislation creating and de-
marking for the first time the power, but it comprises por-
tions of two distinct Acts of Assembly passed with an in-
terval of more than eleven years between the dates of their
adoption, the one being supplementary to the other.    But
when they were codified, the last in point of enactment,
which when enacted was simply a supplement to the former,
was placed *first* in *sec. 30*, and the first in date of passage,
and which when passed *created* the power, was placed *second*
in order in the body of the section.    This circumstance, how-
ever, cannot alter the construction which ought to be placed
on *sec. 30*, as found in the Code, or make it denote precisely
the reverse of the meaning which its component parts as
originally enacted obviously bear.

As the fundamental question is, whether the ordinance
that strips the Mayor of Baltimore City of all participation
in making appointments of municipal *officers* is a valid ex-
ercise of the powers, or of any of the powers, given by the
charter of the city, it will not be amiss first to quote the
section of the Local Code under which it is claimed the
power to pass the ordinance does exist, and then to tran-
scribe the two Acts of Assembly which are embodied in and

make up that section. *Sec. 30, Art. 4, Local Code*, reads as follows : "They may pass ordinances regulating the manner of appointing persons to office under the corporation, which they are or may be authorized by law to appoint, but unless such ordinances be passed the Mayor shall nominate, and by and with the advice and consent of a convention of the two branches of the City Council, shall appoint all officers under the corporation, except, &c." *Sec. 2, of ch. 148, Acts of 1817*, provides : "And the Mayor of the City shall nominate, and by and with the advice and consent of a convention of the two branches of the City Council, shall appoint all officers under the corporation, except, &c." And the *Act of 1828, ch. 114*, declares : "That the Mayor and City Council may pass ordinances regulating the manner of appointing persons to office under said corporation, which they are now or may hereafter be authorized by law to appoint, anything in the second section of the Act to which this is a supplement, to the contrary notwithstanding."

Now it must be conceded, because it is too plain for denial, that if the Act of 1817 had been incorporated in the Code, without qualification of any kind, and just as the Act stood on the day of its adoption more than three quarters of a century ago, appointments to city offices could only be made by the *Mayor* with the advice and consent of a *convention of the two branches of the City Council.* Under that Act the Mayor and the City Council were the depository of the power to make appointments. To those two constituent, but separate and independent departments of the city government, was the *power* of making appointments confided. But more than this ; not only was a power thus conferred, but the *method* of its exercise was prescribed.

The Mayor nominated and by and with the advice and consent of the convention appointed. This was not a power given to the municipality as a mere corporate entity, to be exercised like other corporate powers in the usual and ordi-

nary way ; but, having been given to the Mayor and to the
City Council distributively, the manner of its exercise by
them was specially and distinctively declared.   The execu-
tion of the power was placed in the Mayor and a *conven-
tion* of the two branches, but not in the branches separately.
The method or manner of its exercise was therefore specifi-
cally pointed out.   Obviously, so long as that provision
remained unchanged by the Legislature, no other or differ-
ent method of exercising the power to make appointments
could have been resorted to by the municipality, and neither
the Mayor nor the City Council could have invaded the
distinctive province of each other.   What, then, was the
effect of the Act of 1828 ?   Did it change the *depository*
of power, or merely authorize the *same* depository to exert
the power of appointment in some other manner which the
municipality might by ordinance prescribe ?

   This Act of 1828 was passed at the instance and upon
the request of the Mayor and City Council.   A resolution
requesting the Delegates from the city in the Legislature to
procure an amendment to the charter empowering the
corporation to pass ordinances *regulating the manner* of
appointing officers was presented to the General Assembly,
and conformably to that request the Act, a draft of which
accompanied the resolution, was adopted.   The Act of 1828
purported to be a supplement to the Act of 1817, and pro-
vided, as stated before, that the Mayor and City Council
might pass ordinances *regulating the manner* of making
appointments to the offices which " *they*," that is, the Mayor
and City Council, *are* or may hereafter be by law author-
ized to make, " anything in the second section of the Act to
which this is a *supplement* to the contrary notwithstand-
ing."   This Act gives a power, not to *make* appointments,
but to *regulate the manner* of making such appointments as
" THEY," the Mayor and the City Council, *are* or may here-
after be by law authorized to make ; and it does this not-
withstanding there is "anything" to the contrary as to
their power to *regulate* the manner of appointments con-

tained in the Act of 1817, but it neither in terms nor by implication interferes with the depository of power *to make* appointments. On the contrary, the Legislature, recognizing that both the Mayor and the City Council, as separate, co-ordinate branches of the municipal government, had been clothed with the power *to make* appointments of municipal officers, was, in the Act of 1828, careful to provide only a subsidiary power by which the *manner* of making appointments might be *regulated* as to such officers as *they*, the Mayor and City Council, not the municipality, but the Mayor and the City Council as separate branches of the municipality, *then* had or might thereafter have the power to appoint.

In effect, the Act reaffirms the existence of the power of the Mayor and of the City Council, and then gives to the municipality in its corporate capacity the further power to pass ordinances, whether with the approval of the Mayor or over his veto is wholly immaterial, whereby the *manner* of making appointments by the *Mayor and* the *City Council*, each having a voice, might be regulated. It was manifestly not the design of the Act of 1828 to put it in the power of the City Council to strip the Mayor of all participation in making appointments, any more than it was contemplated that under the power to *regulate* the manner of appointments both the Mayor and City Council could, by ordinance, divest themselves of that power altogether and delegate it to a total stranger.

The language of the Act of 1828 is explicit. Bearing in mind that when that Act was passed the Mayor nominated and a *convention* of the two branches assented to all appointments, and that, therefore, *both* the Mayor *and* the City Council, as distinct entities, were vested with the *power* of appointment, it seems obvious that when the Act of 1828 gave authority for the adoption of ordinances intended to *regulate* the *manner* of making appointments which *they*, the Mayor and the City Council, were confessedly *then* empowered by law to make, it did not take away the joint power antecedently possessed to appoint, but simply pro-

vided that some different *method* of exercising that *same joint power* might be resorted to. But if this were not abundantly clear, it is certainly made so when the *thing* authorized by the Act to be done is considered. Now, the *thing* authorized by the Act to be done was to pass ordinances *regulating the manner* of appointing persons to office; and it comes to this inquiry : Does the authority to *regulate* the manner of doing a thing of itself take away the antecedent *power* to do the thing? The *power* to do a thing must precede its exercise. It may be given coupled with a defined method of execution, or it may be given simply and nakedly without an accompanying modal regulation. But if, afterwards, in the one instance, the defined method of execution be altered, or in the other a modal regulation be added, yet in neither event would the *power* be thereby necessarily destroyed—the power to do the thing would remain though the manner of doing it might be changed.

To briefly restate the proposition : The Act of 1817 did two things. It first gave to the Mayor and to the City Council jointly the power to make appointments; secondly, it prescribed the mode or manner in which that power should be exercised. The Act of 1828 did but *one* thing. It did *not* disturb the power to make appointments, but it did confer authority to prescribe by ordinance a new or different manner for the exercise of the power—the power still residing where the Act of 1817 had reposed it.

Now, then, the power of the Mayor and City Council to jointly make the appointments under the Act of 1817 was not destroyed by the Act of 1828, unless the authority to *regulate* the *manner* of exercising the power took away the power itself. It could only do this upon the assumption that the power to *regulate* means the power to *destroy*. That such is not the meaning of the term in Maryland has been determined more than once. In *State* v. *Mott*, 61 Md. 297, an ordinance of the city of Baltimore, whereby the burning of lime within the city limits was prohibited, was

sought to be upheld under that provision of the charter which gave the city authority to "regulate the places for manufacturing soap and candles, &c., and where every other offensive trade is carried on." This Court said: " The power delegated is simply to regulate the places where they are carried on, and not to forbid their being carried on, or to destroy them altogether." And in *State* v. *Whitman*, 80 Md. 410, it was held that a power to *regulate* the liquor traffic was not a power to destroy the trade. See also, *Brown* v. *O'Connell*, 36 Conn. 432.

As illustrating the correctness of the construction placed on the Acts of 1817 and 1828, in this opinion the case of *Commonwealth Ex rel. Graham* v. *Crogan*, Pa. St. 26 At. Rep. 697, may be cited. Information of John M. Graham, district attorney of Luzerne County, was filed, giving the Court to understand that Michael Crogan had exercised the office of street commissioner of the city of Wilkes-Barre without warrant of law. The defendant had been appointed street commissioner of the city of Wilkes-Barre by the action of the City Councils. The position of the relator was that a valid appointment to the office required the concurrent action of the City Councils and the Mayor. The title of the defendant depended on this question. The charter of the city gave the Mayor and Councils the power " to appoint and remove such officers * * * * as they may deem necessary to * * * * enforce the ordinances and regulations of the city. The Supreme Court of Pennsylvania said : " Neither the Mayor nor the Councils can make the appointment any more than they could make the ordinances the officers are appointed to enforce." · And in speaking of the charter the opinion proceeds : "It empowered the Mayor and Councils to create additional offices and to fill them. In the exercise of this power they have created a single office for the entire city, called street commissioner, and the mere fact that the office was created by them is conclusive upon the necessity for their concurrent action in order to fill it. It is

needless to add that the city ordinance, relied on as author-
ity for the appointment by the Councils alone, cannot
change the law or deprive the Mayor of the powers which
the law gives him without his consent." And judgment of
ouster was entered.

When the codifiers of 1860 consolidated the Acts of
1817 and 1828, in sec. 25 of Art. 4, Code of Pub. Local
Laws, they placed the provisions of the Act of 1828 first,
and Mr. Poe, in the Code of 1888, in sec. 30, of the same
Art. of the new Code, followed his predecessors. But
this circumstance can make no possible difference in the
meaning of the Acts as codified. Both Acts are in the
section, and when they were brought together there, their
meaning was precisely the same as when they stood sepa-
rately and apart. The *power* of the Mayor and of the
City Council as two independent co-ordinate branches of
the city government to make appointments of officers is
still retained in the section, as conferred by the Act of 1817 ;
the *mode* of making such appointments designated in the
Act of 1817 is still there, and may be exercised, unless
the authority given by the Act of 1828 (which is also
there) to *regulate* the *manner* of appointments, which
"*they*," the two departments, the Mayor and the City
Council, are authorized by law to make, is validly exerted.
To give to these two statutes when codified a meaning
precisely the opposite of the one they had before they
were codified, merely because the one passed last in order
of time happens to be transcribed first in the same section
of the Code which contains them both, would invoke, or
rather invent, a new and a very dangerous rule of interpre-
tation. Statutes should be construed with a view to the
original intent and meaning of the makers, and such con-
struction should be put upon them as best to answer that
intention which may be collected from the cause or neces-
sity of making the Act, or from foreign circumstances ;
and when discovered, ought to be followed, although such
construction may seem to be contrary to the letter of the
statute. *Johnson* v. *Heald, Ex.* 33 Md. 352.

Now, it cannot be assumed, in the face of the explicit language used in the Act of 1828 and literally reproduced in sec. 30 of Art 4 of the Code of Local Laws, that the Legislature ever intended to give to the municipality of Baltimore the power to pass ordinances delegating to any one the right to name the many important officers that the efficient discharge of the public trusts committed to the corporation may require. And yet, if it be conceded that the Mayor may, under sec. 30, be deprived of all power as an integral part of the appointing power, because the power to regulate the manner of appointments means if the City Council so enacts over his veto an abrogation of his antecedent power to participate therein, there is no escape from the conclusion that there can be by ordinance passed, with or without his approval, a valid delegation of the appointing power to *one* branch of the City Council ; and if to it, then likewise to a single individual not even a member of the city government. Such a construction means that there may be a lawful surrender of the power to appoint, and under the guise of regulating the manner of appointment, a transfer of the whole power itself to an alien. And why not ? If the statutes do not place this power in the Mayor and the City Council to be executed by *them*, but gives them unlimited and unrestricted authority to pass any regulation they may see fit as to the *manner* of making appointments, there is no line at which logically you must halt and say the ultimate limit has been reached beyond which the delegation of the power of appointment shall not go. That such a surrender or transfer to another of the power to appoint is not likely to occur may be probable, but this probability is no answer to the argument that the construction contended for irresistibly establishes its *possibility*. The bare possibility that such a result may flow from a judicial construction of a statute is sufficient to demonstrate the utter fallacy of the interpretation, especially when there is another and a different construction which is far more reasonable and which leads to no such serious

consequences.   A construction fraught with consequences
so pernicious, as well as so dangerous to the order and
good government of a great city, must be rejected, unless
the plain, imperative words of the Act of Assemby are open
to no other meaning at all.

Perhaps it may not be out of place before concluding this
opinion to cite a few cases in which this Court has held that
for the purpose of ascertaining the meaning of a section or
provision of the Code, the original Act of Assembly em-
bodied in the section or provision under consideration may
be consulted.   Thus in the recent case of *Miles* v. *Steven-
son*, 80 Md. 366, it was insisted that *mandamus* was not
the proper remedy to compel County Commissioners to
restore a road supervisor to the office from which they had
removed him, because sec. 81, Art. 5 of the Code, giving
to every party aggrieved by an order passed by the County
Commissioners, a right of appeal therefrom to the Circuit
Court, furnished an appropriate remedy by appeal.   We
went into an examination of the original Act from which
the section was codified, and finding that the Act when
adopted, had reference only to cases relating to public roads,
and that the section providing for an appeal to the Circuit
Court was, when passed, confined to appeals in such pro-
ceedings, we held that an order removing a road supervisor
from office was not such an order as under that section of
the Code could be reviewed on appeal by the Circuit Court,
though the terms of the section taken by themselves in the
place where found in the Code, and without reference to
the original Act by which they were first adopted, were
probably broad enough to embrace just such an order. See
also *Maurice* v. *Worden*, 52 Md. 294; *State* v. *Popp*, 45 Md.
432; *Dorsey* v. *Garey*, 30 Md. 499.

For the reasons given, the ordinance in question is, in our
opinion, *ultra vires* and void.   As a consequence the ap-
pellee was not lawfully elected City Tax Collector, and
hence the writ of *mandamus*, which issued, directing the
Mayor to administer to the appellee the oath of office,

should not have been ordered. The order appealed from must therefore be reversed, and the petition for a writ of *mandamus* must be dismissed.

> *Order reversed and petition for writ of mandamus dismissed, with costs above and below.*

(Decided November 19th, 1896).

RUSSUM, J., dissented and delivered the following opinion :

Notwithstanding the high esteem in which I hold the judgments of my learned brothers, I am unable to concur in their conclusions in this case, and it is proper that I should give the reasons for my dissent. We agree in everything except the proper construction of the charter of Baltimore City, contained in Article 4 of the Code of Public Local Laws, and the extent to which the Acts of 1817, ch. 148, and of 1828-9, ch. 114, should control that construction.

This Court has, in several cases, considered the effect of the omission of Acts and parts of Acts from the Code of Public General and Public Local Laws, and laid down the rules by which the Code should be construed. In the case of the *Mayor, &c., of Frederick* v. *Groshon*, 30 Md. 443, the controversy related to the Act of 1847, ch. 224, which authorized the Mayor, Aldermen and Common Council of Frederick City to open and widen Carroll Creek, in that city. The Act was not included in the Code of Public Local Laws, title Frederick County, and it was contended that, being a *franchise*, it was still operative, notwithstanding the omission. JUDGE ALVEY, in denying this contention, said : " It would involve the necessity of constantly examining the great multitude of Public Local Acts, in regard to the municipal corporations of the State, in the scattered and disconnected form in which they originally passed, and the doubt and controversy would be endless, as to what were the rights and privileges of such corporations

existing at the adoption of the Code. The object   *   *   *
was to arrange and simplify the whole body of the statute
law of the State, and the Legislature, in adopting it as a
substitute for all the Public General and Public Local Sta-
tute Laws then existing, plainly intended an entire repeal
of all such statutes of that character, then on the statute
books, as were *not* embraced in the codification ; for other-
wise, instead of simplification, the greatest confusion would
ensue." In case of *Johns* v. *Hodges and wife*, 33 Md. 523,
JUDGE STEWART, delivering the opinion of the Court, said :
"The Legislature designed to preserve all that was needful,
and to discard what was obsolete or inapplicable, and re-
lieve the statute book from all useless matter." "Where
its language is the same as that of any antecedent law, the
well-established construction is to be regarded. If the
terms are *substantially different*, they must have their plain
and obvious interpretation, and not be *strained* to conform
to previous legislation." It "is to be understood and ex-
pounded according to the law establishing it, as a substitute,
and such meaning must be given the language employed
as a just construction will warrant." Again, in the case of
the *Western Maryland College* v. *McKinstry*, 75th Md. 189,
in which the omission of the second section of the Act of
1884, ch. 293, relating to the execution of wills from the Code
of 1888, was passed upon this Court through the present
learned and distinguished Chief Justice, said : " If the statute
law of Maryland had stood, at the date of the death of Miss
McKinstry, as it did stand before, and for more than five
years after the execution of her will, that paper would have
been admitted to probate as a valid will of personal
property." * * * * " But, in the recent codification
of the law, the second section of the Act of 1884, which
carefully and liberally protected from the operation of the
Act all wills made prior to August first, 1884, was omitted,
and is, consequently, *no longer the law of the land.*" Hav-
ing these decisions in view, let us examine the Acts of 1817,
ch. 148, sec. 2, and of 1828-9, ch. 114, and see how far

they have been incorporated into Art. 4, Code of P. L. L., and are now a part of the charter of Baltimore City, and how far they have been " repealed," " discarded as obsolete," and, by its adoption, " are no longer the law of the land."

The second section of the Act of 1817 provides that the annual session of the City Council shall begin on the first Monday in January; that two-thirds of each branch shall be a quorum to do business ; that all persons holding offices under the corporation shall hold during the pleasure of the Mayor, unless otherwise provided for by Acts of Assembly, or by ordinances of the city, and then proceeds as follows : " And the Mayor of the city shall nominate, and by and with the advice and consent of a convention of the two branches of the City Council, shall appoint all officers under the corporation, except the Register of the city, and the clerks employed by the city, or under their authority." The Act of 1828–9, ch. 114, which was passed as a supplement to the Act of 1817, and in accordance with a joint resolution of the Mayor and City Council, requesting that the charter be so changed as to empower the corporation to pass ordinances " regulating the manner " of appointing city officers, is as follows : " That the Mayor and City Council of Baltimore may pass ordinances regulating the manner of appointing persons to office, under said corporation, which they are now or may hereafter be authorized by law to appoint, anything in the second section of the Act to which this is a supplement to the contrary notwithstanding." Section 30 of Art. 4 of the Code of Public Local Laws, title Baltimore City, reads as follows : " They may pass ordinances regulating the manner of appointing persons to office under the corporation which they are or may be authorized by law to appoint, but, *unless such ordinances be passed*, the Mayor shall nominate and by and with the advice and consent of a convention of the two branches of the City Council, shall appoint all officers under the corporation, except the Register," &c.

A careful comparison of these Acts of Assembly with

each other, and with the Code will show that, after the
passage of the Act of 1828–9 the power of appointment to
office under the corporation, was taken from the Mayor
and transferred to the corporation, in obedience to the re-
quest of the Mayor and City Council; and (2) that, by the
adoption of the Code, the charter was entirely changed, by
the omission of all authority in the Mayor to appoint per-
sons to office, except in the event that ordinances were not
passed " regulating the manner " of their appointment. The
first of these propositions is conclusively proven by the lan-
guage of the Act of 1828–9, which authorized the *" Mayor
and City Council of Baltimore"* to pass ordinances " regu-
lating the manner of appointing persons to office under *said
corporation*—meaning thereby the corporation whose name
is the Mayor and City Council of Baltimore. As was well
said by the learned Judge below, " If it was intended by
the Legislature that they should each, or either, continue
to be necessary constituents in the act of appointment, what
possible purpose was there in the passage of the Act? "

The second of these propositions is proven by the addi-
tion in the Code of the words " unless such ordinances be
passed, the Mayor shall nominate, and by and with the ad-
vice and consent of a convention of the two branches of
the City Council, shall appoint all officers under the cor-
poration, except the Register," &c.   The addition of these
words made an entire change in the charter of Baltimore
City, so far as the Mayor's power of appointment of per-
sons to office was concerned, by omitting therefrom the
positive and unequivocal authority to make such appoint-
ments, and limiting it to the *contingency* of a failure on the
part of the corporation to " pass ordinances regulating the
manner " of making them. The Act of 1817, ch. 148, hav-
ing been repealed by the adoption of the Code, cannot be
revived by construction. *Pingree* v. *Snell*, 42 Maine, 53;
1 Pick. 45; 23 *Am. & Eng. Ency. Law*, 487, and cases
there cited.   Any other construction would render the
change made by the Legislature meaningless, and operate

as a judicial reconstruction of section 13, by excepting from its provisions all ordinances relating to the making of appointments to office. The cases of *State* v. *Popp*, 45 Md. 432 ; *Maurice* v. *Worden*, 52 Md. 204, and *Dorsey* v. *Garey*, 30 Md. 499, do not conflict with this construction. In *Popp's case*, 45 Md. 433, it was merely decided that, in construing the Code, all parts *in pari materia* must be read together, regardless of the *heading* under which they are found, and, in the other cases, where the meaning of the original Act was looked to, the language in the Code was either identical, or substantially the same as that in the original Acts, and they come fully within the canons of construction laid down by JUDGE STEWART in the case of *Johns* v. *Hodges and wife*, 33 Md. 523.

But, it is claimed that the power to regulate "the manner of appointing persons to office" does not include the power to make the appointment, because that would destroy the right of a constituent element thereof (the Mayor) to participate in such appointment, and the cases of *State* v. *Mott*, 61 Md. 297 ; *State* v. *Whitman*, 80 Md. 410 ; *Brown* v. *O'Connell*, 36 Conn. 432, and *Graham* v. *Grogan*, 26 Atl. 697 (155 Pa. St.), are relied upon as supporting this contention. In the case of *Brown* v. *O'Connell*, the statute under consideration was in contravention, not of some supposed or inferential restriction, but of the express, positive, mandatory provision of the Constitution of Connecticut. In *Mott's case*, 61 Md., and *Whitman's case*, 80 Md., the ordinance, or statute, under consideration was an absolute inhibition of a particular thing, such as the reducing to lime of *any* oyster shells within the limits of Baltimore City, and the sale of *any* liquor in the Seventh District of Dorchester County. These are vastly different from the case under consideration. The ordinance in this case does not prohibit directly or indirectly, the levy and collection of taxes, nor does it in any particular cripple the machinery for collecting them. The same breath that repeals re-enacts with full force and vitality, and these cases are, therefore,

clearly distinguishable from the one under consideration. By the charter of the city of Wilkes-Barre the power of the corporation is vested in the corporate officers, the Mayor being one of them. He was a constituent element in the exercise of the powers granted by the charter, and the ordinance under consideration, in *Graham* v. *Grogan* (26 Atl. Rep. 697–155 Pa. St.), having denied him his right to participate in the appointment of the officers therein mentioned —not being the act of the depository of the power—was declared invalid by the Supreme Court of Pennsylvania.

The charter of Baltimore City vests no such power in the Mayor. Whatever power he possesses is not inherent in the executive office, but must exist, if at all, by virtue of the authority conferred upon him by the sovereign power, to-wit, the Legislature. *Meech. on Pub. Off.* secs. 108–109.

There is no inhibition in this State which prevents the legislative branch of the government from exercising the power of appointment to office. This question was before this Court and expressly decided in the case of *The Mayor, &c.,* v. *The Board of Police,* 15 Md. 376. It was urged in that case that the Act of Assembly violated Art. 6 of the Declaration of Rights, which declared that the Legislature, executive and judicial powers ought to be kept separate. In denying this contention, JUDGE TUCK said: "We are not prepared to admit that the power of appointment to office is a function intrinsically executive" * * * * "namely, that it is inherent in and necessarily belongs to the executive department. And JUDGE LeGRAND, in an able and exhaustive concurring opinion, quoting *Crane* v. *McGinnis,* 1 G. & J. 472, said: "The legislative department is nearest the source of power, and is manifestly the predominant branch of the government." Cities and counties are but local divisions of the State, organized for the more economical administration of the government. Every power they possess could be exercised by the Legislature. (*Daly* v. *Morgan,* 69 Md. 467). In the absence of a charter for Baltimore City, the Legislature could levy all taxes, ap-

point all officers and provide for everything necessary to govern the city. Not choosing to do this, it has granted a charter to " the inhabitants of Baltimore," *by the name of* " The Mayor and City Council of Baltimore," and delegated to them, as a corporation, all the powers it possessed that were necessary to an efficient government of the city— among which was the legislative authority to *create* offices, and the power of controlling (regulating) " the appointment of persons to office." The corporation having the power to create offices and to regulate appointment of persons thereto, possesses all the powers of the Legislature over the subject, and that includes the powers to appoint. *Mayor* v. *Board of Police*, 15 Md. 376; *Trowbridge* v. *Newark*, 49 N. J. L. 144; *Shallcross* v. *Bridges*, 6 W. Va. 591. The donee of a power who executes it, cannot be said to have delegated it, and, in passing the ordinance declaring that the City Collector should thereafter be appointed by a convention of the two branches of the City Council, there was neither an unwarranted assumption, nor a delegation of power, but merely the exercise of the power of the State, conferred by the charter—the exercise of the legislative function of predetermining what the law shall be for the regulation of all future cases falling under its provisions. *Vide, Bates* v. *Kimball*, 2 D. Chipman (Vt.), 77; *Newland* v. *Marsh*, 19 Ill. 383; *Cooley Const. Lim.* (5 ed.), pp. 108-109. • This construction has received the sanction of " the Mayor and City Council " since 1829. Referring to the cotemporaneous construction of the powers granted by the Act of 1829, and the Code of Pub. Local Laws, Art. 4, as evidenced by the City Code of 1893, the learned Judge below said: "The different modes of appointment therein provided for, show that it has never been supposed, since 1829, that the statute law required the concurrence of the Mayor and City Council in the Act of appointment, or that each of them was a necessary constituent of the Act." The cotemporaneous construction of the charter, of such duration, continuously practiced under, ought not to be shaken, but

upon the ground of manifest error and cogent necessity. The power having been exercised, in the manner provided in the ordinance under consideration, from 1829 to the present time, "ought to be deemed almost conclusive evidence of its possession." *Kierstead et al.* v. *The State*, 1 G. & J. 248 ; *Edgerton* v. *Reilly*, Ibid, 385 ; *Bradford* v. *Jones*, 1 Md. 369 ; *State* v. *Mayhew*, 2 Gill, 468 ; *Harrison* v. *The State*, 22 Md. 491.

Finally. On a former appeal between the parties to this cause (*Creager* v. *Hooper, Mayor, &c.*, 83 Md. 490,) we remanded it, in order that " the ends of justice might be promoted " by a trial " upon its merits." The ordinance in question was set out in the petition and the power to pass it denied by the answer, and the question argued in the briefs and orally, at least by the appellant. With great deference to my learned brothers, it seems to me that so far as the question of *ultra vires* is concerned we are concluded by that decision, since there could not possibly be any " merit " in, nor any " end of justice to be promoted by the trial of a case which had no other foundation than an *ultra vires* ordinance. I am, therefore, of opinion that the order directing the peremptory *mandamus* to issue should be affirmed.

(Filed December 3rd, 1896).

A motion for a re-argument was subsequently made, and in disposing of it,

McSHERRY, C. J., delivered the opinion of the Court.

We have carefully considered the elaborate brief mailed to us before being filed in support of the motion made for a re-argument of this case, but we fail to discover any reason why the motion should prevail. There is no occasion for a re-statement of the grounds upon which the conclusion reached by a majority of the Court was founded, but inasmuch as it seems to be supposed that we ignored the provisions of the Code of Public Local Laws and founded our

judgment upon antecedent Acts of Assembly alone, it may
not be amiss to remove this misapprehension. What we did,
was to construe a particular section of the Local Code,
which was not new legislation, by referring back to, and as-
certaining the meaning of, the original Acts of Assembly
that were compressed and consolidated in that section. This
is a perfectly familiar method of construction, often followed
by this and by other Courts, and is in no way at variance
with the case of *Mayor, Aldermen, &c., of Frederick* v. *Gro-
shon*, 30 Md. 436, and others of that type relied on in the
brief. The case at bar and the case in 30 Md. are as wide
apart as the extremities of the earth's axis. In *Groshon's
case* it was insisted that a public local Act of Assembly re-
lating to the municipality of Frederick and passed long be-
fore the Code of 1860 was adopted but not incorporated in
that Code when it went into effect, was still in force after
the Code became operative, and was in force in spite of the
declaration of the Legislature that all Public General and
Public Local Laws not included in the Code were repealed.
It was held that the Local Act was repealed because not
included in the Code—the Code having superseded all other
Public General and Public Local legislation. But in this
case there is no such condition. Both the Acts of 1817
and 1828 are incorporated in section thirty of Article four,
of the Local Code, and there is no question of repeal in-
volved at all—the sole question being one of construction,
or as to the meaning of a statute confessedly in force. In
the *Groshon case* the effort was to rescue a statute from re-
peal. In this it is to ascertain the meaning of an unrepealed
statute.

It is also contended that the decision by this Court in
June last upon the record then brought up between the
same parties, practically conceded the power of the City
Council to pass the ordinance we have pronounced *ultra
vires* and consequently invalid. And it is suggested that
unless this Court had then supposed that the City Council
possessed the power to enact the ordinance as actually

passed we would not have sent the case back for a hearing on its merits. But it was precisely because the case was *not then* before us on the merits, and precisely because the construction of the statute was *not* involved on the former appeal that this *ultra vires* question was not at that time considered or passed upon. Indeed, in the opinion filed in June we were careful to say: "The merits of the controversy have never been passed on by the Court *nor has the case ever been in a condition that they could be passed upon.* \* \* But in remanding the case it is proper to say that the questions involved are either those touching the passage or *existence* of an ordinance, or questions resulting therefrom, &c. \* \* For these reasons the case will be remanded *that it may be tried on its merits.*" Had we stepped out of our way to decide a question not discussed by the counsel for the Mayor because not included in the interlocutory and technical point of pleading then solely before us, or to determine the merits, when we explicitly declared that the merits were not before us for adjudication at all, we would have departed widely from the settled policy of this Court, and we would have clearly exceeded the prescribed limits of our jurisdiction as an appellate tribunal.

We do not deem it necessary to pursue the subject further and we merely add, in conclusion, that we are authorized by JUDGE ROBERTS and JUDGE BOYD to say for them, that though they did not sit during the oral argument of the case, they have examined the question of *ultra vires* and fully concur in the conclusion reached by the Judges who united in the majority opinion.

The motion for a re-argument is overruled.

*Motion overruled.*

(Decided January 7th, 1897).